400 E. BALTIMORE STREET, INC., BLOCK NEWS, INC., PHILLIP DAVID LONG, THOMAS F. CRAIG, JOSEPH D. STEPHENS, DAVID THOMAS STOUGHTON, CHARLES BOOKS, INC., DEBORAH ROYOLA REDDING A/K/A DEBORAH ROYOLA PIERCE v. STATE OF MARYLAND

[No. 1500, September Term, 1980.]

*Decided June 8, 1981.*

148

The cause was argued before GILBERT, C. J. and THOMPSON and WILNER, JJ.

*Burton W. Sandler,* with whom was *Jerre S. Diener* on the brief, for appellants.

*Patricia E. McDonald, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General of Maryland, F. Ford Loker, Assistant Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *John Prevas, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

Md. Ann. Code Art. 27, § 418 provides, in relevant part, that every person who knowingly "exhibits, distributes, or offers to distribute, or has in his possession with intent to distribute or to exhibit or offer to distribute, any obscene matter is guilty of a misdemeanor." Section 423 of that article, however, states that the "prohibitions and penalties imposed in this subtitle [which includes § 418] shall not extend to persons having bona fide scientific, educational, governmental, or other similar justification for possessing such matter, or to distributions thereof pursuant to such justification."

After a non-jury trial in the Criminal Court of Baltimore, appellants were convicted of having violated § 418, for which they were each fined $500. In an effort to overturn those convictions, they contend, first, that the court failed to make the necessary finding that the materials in question were obscene, and second, that § 418, when read in conjunc-

tion with § 423 and in the light of controlling constitutional limitations, is invalid, both as written and as applied to their activity. There is merit in their first contention but none in their second.

The cases against appellants, which were consolidated for trial, proceeded upon an agreed statement of facts, supported by certain agreed exhibits. The evidence, so produced, established the following:

(1) On February 28, 1979, police officer Danny Brown walked into a bookstore at 420 E. Baltimore Street owned by appellant Block News, and, for $6.00 each, purchased from appellant Long, the clerk managing the store, two magazines entitled "Pretty Girl Film Review," issues No. 3 and No. 4.

(2) On May 9, 1979, police officer Melvin Kelbaugh also frequented that store and, for $7.50, purchased from appellant Craig, the clerk then in charge, a magazine entitled "Swedish Erotica," issue No. 22.

(3) On May 15, 1979, police officer Eric Husok entered a bookstore located at 1827 N. Charles Street owned by appellant Charles Books, Inc., and, for $9.95, purchased from appellant Stephens, the clerk in charge, three magazines — "Wet," "Hot Baby," and "Route Sixty Sex."

(4) On June 4, 1979, police officer Bruce Patton went to a bookstore at 400 E. Baltimore Street owned by appellant 400 E. Baltimore Street, Inc., where, for $6.00, he purchased from appellant Stoughton, the clerk in charge, a magazine entitled "Swedish Erotica," issue No. 23.

(5) On November 16, 1979, officer Husok visited the store at 420 E. Baltimore Street (appellant Block News) where, for $6.00, he purchased from appellant Redding (a/k/a Pierce), the managing clerk, a magazine called "American Erotica."

(6) In each instance, the officer promptly took the magazine(s) to a judge of the District Court who found them to be obscene. Based upon those determinations, the instant charges were filed.

(7) In each instance, the police officer, dressed in mufti, entered the store, wandered about, selected the magazine(s)

he wanted, took them to the clerk, and purchased them for the posted price. The magazines on display, including those purchased, were wrapped in cellophane, permitting the browsing customer to see the covers but not the inside pages.

(8) There were, throughout the stores, signs stating that "[t]he material sold in this store is sold only for scientific, educational, governmental or other similar justification and the customers agree that they are purchasing these materials only for scientific, educational, governmental or other similar justification," or words of similar import. No one asked the officers whether, in fact, they were purchasing the magazines for any of those purposes; nor did they volunteer their purpose in making the purchase. The individual appellants, if called to testify, would have stated that, had the officers told them that they (the officers) were not buying the magazines for the reasons set forth on the signs, the appellants would not have accepted their money.

(9) The three stores hold themselves out as "adult" book stores and are located in areas devoted or catering to "adult entertainment." [1] The magazines purchased by the officers were fairly representative of the merchandise on display and offered for sale at the three stores.

(10) The policemen used public funds to pay for the magazines. There was "allocated in the vice unit a certain amount of money to make purchases in the area of obscenity and gambling and prostitution money. This general fund was used to make this evidentiary purchase."

The convictions rested upon these facts, upon the magazines purchased by the officers, and upon photographs of the signs posted in the stores (see ¶ 8 above), the magazines and photographs being admitted into evidence without objection.

---

1. The two stores located in the 400 block of East Baltimore Street are in a special adult entertainment zoning district. *See* Baltimore City Municipal Central Area Renewal Plan, approved March 8, 1977. The third store, on North Charles Street, is not in such a district; however, the evidence showed that the block in which it was located contained "a number of places of adult entertainment" — *i.e.*, "bars, night clubs, with dancing go-go girls, advertisement on the outside, there are a number of book stores, that advertise themselves to be adult book stores."

In this appeal, appellants complain:

"I. The appellants were denied due process of law and equal protection of the laws in violation of their constitutional rights under the First, Fifth and Fourteenth Amendments, when the Trial Court found the appellants guilty on the basis that the cases were tried on the theory that the obscenity of the materials was assumed.

II. The Trial Court erred in finding that the appellants did not come within the exemption of Article 27, Section 423, thereby denying to appellants due process of law and equal protection of the law under the Fifth and Fourteenth Amendments to the United States Constitution.

III. Article 27, Section 418 denied to appellants equal protection of the law because it creates an arbitrary and capricious classification.

IV. Article 27, Section 418, is inoperable and unenforceable because on its face it recognizes that obscene material has scientific, educational, governmental or other similar justification, some of the elements that the Supreme Court in Miller v. California mandated material cannot possess in order to come within the ambit of the First Amendment."

### (1) *Assumption of Obscenity*

Three proceedings were held in the trial court. The first, on March 25, 1980, was nominally for the purpose of considering appellants' several motions to suppress the magazines and to dismiss the charges. Those motions, virtually identical in each case, rested on essentially the same grounds — that the underlying statutes were unconstitutional for a variety of reasons, that the charges were vague and insufficient, and that the magazines (and

their distribution) were constitutionally protected. It was agreed at that proceeding that, if those motions were denied, the case would proceed before the court, sitting without a jury, on an agreed statement of facts, and that the court would take the entire matter *sub curia.* Pursuant to that agreement (and without objection), the court made the necessary inquiries under Maryland Rule 735d, accepted from appellants their waiver of a jury trial, and had placed in the record the agreed statement and exhibits recounted above.

The second proceeding, which occurred on June 16, 1980, was taken up with discussion of the various legal issues raised by appellants. The primary thrust of appellants' argument was that, even if obscene, by virtue of the signs scattered around the stores the magazines and their distribution were exempt from criminality under § 423. In that limited context, appellants expressed no objection to the court assuming that the magazines were, in fact, obscene, their point being that, because § 423 permitted obscene material to be exhibited and sold for certain purposes, it made no difference whether they were obscene. They made clear, however, that they were not conceding obscenity in the event the court rejected their exemption argument. Again, the court held the matter *sub curia.*

Judgment day was November 3, 1980.[2] The court, after noting that the "key issue" was an interpretation of § 423, observed that the cases "were tried on the theory that the obscenity of materials was assumed and that the defendants ... could not be found guilty of these charges because of the application of the exemption." That, as we have noted, had been the primary issue argued by appellants, both orally and in the extensive memoranda supplied to the court, although at the June 16 hearing, defense counsel made clear to the court that "[i]f you decide against us on a motion for judgment of acquittal then you as a finder of fact must make a

---

2. There can be little doubt from the transcripts of the three proceedings that the verdicts were rendered at the November 3 proceeding. The docket entries, however, show the verdicts of guilty as having been entered on March 24, 1980. To that extent, the docket entries are clearly in error and ought to be corrected.

determination by determining on a contemporary community standard ... what would be in the minds of the jury." It is evident from the record, however, that the court omitted to make that ultimate finding. Although it characterized the magazine covers as "sexually explicit" and concluded that such cover scenes were sufficient to alert appellants "that the material inside *may be* obscene" (emphasis supplied), the court never discussed the criteria necessary for a finding of obscenity and never actually made a finding that the magazines were, in fact, obscene. After finding that the exhibition and distributions were not protected by § 423, the court simply entered sentence, and thus forgot that § 423 has no application and is entirely irrelevant unless the material is first found to be obscene under § 418.

It is not necessary, of course, for a trier of fact to *announce* its verdict in the context of specific issues. But, whether trial is before a court or a jury, in order for a conviction to be sustained, the record must show in some way that, in rendering its verdict, the trier considered and at least implicitly made findings upon all of the factual issues necessary to support a verdict of guilt. In a jury trial, that requirement is normally satisfied through the court's instructions, assuming they are proper ones. In a non-jury trial, the record often tends to be less specific. Courts do not always articulate their findings on each and every element. Such silence is not necessarily fatal, however, if the requisite findings are fairly implicit in the court's verdict and the record does not affirmatively indicate an actual omission to make such findings. The problem here is not mere silence from which a finding of obscenity might be inferred, but an affirmative (and erroneous) statement by the court clearly indicating that obscenity was *assumed.* A court may not assume a critical element of guilt.

This is not a case of insufficient evidence. With the agreed statement of facts and the exhibits, the court had before it enough evidence to support a finding that the magazines were obscene under § 418. The problem is it never made that finding; and, although, through our constitutionally

mandated review of the material we might conclude that it was obscene, such a finding could not serve as a substitute for the required finding by the trial court. We therefore must reverse the convictions. Because the error was one of trial procedure — the failure to make a necessary finding — and not of insufficient evidence to support such a finding, we shall remand the cases for new trials. *Burks v. United States,* 437 U.S. 1 (1978); *Greene v. Massey,* 437 U.S. 19 (1978); *State v. Boone,* 284 Md. 1 (1978).

### (2) *The Other Issues*

Appellants have made clear, both in the trial court and here, that their principal defense to these prosecutions is that of Constitutional and statutory interpretation — the three other issues noted earlier. Those questions will therefore undoubtedly arise in the retrials, and for the guidance of the trial court, we shall address them. Maryland Rule 1085.

Appellants argue that (1) their activities fell within the § 423 exemption; (2) if they did not, § 418, read in the light of § 423, creates an arbitrary classification by authorizing sales only to "formal educators, students or scientists or those in a governmental capacity"; and (3) the two sections, read together, contravene the definition of obscenity mandated by the Supreme Court in *Miller v. California,* 413 U.S. 15 (1973), by recognizing that "obscene" material has scientific, educational, or governmental value.

In order to consider and resolve these challenges, it is necessary for us to trace the historical development of our obscenity law.

The publication and exhibition of lewd and obscene words and writings was initially a concern of the English ecclesiastical courts; but, by the Eighteenth Century, it had become punishable as a common law misdemeanor, either as a libel or as a public nuisance. The underlying rationale for making

such activity criminal was that it tended to weaken the bonds of civil society, virtue, and morality.[3]

The Maryland General Assembly first took note of the problem of obscenity in 1853 when it observed that the publication of obscene and licentious matter in the form of advertisements in newspapers and other periodicals had become more frequent, found that such matter was "exceedingly injurious to the morals of the community," and decided that "the common law in this regard [should] be re-enacted and enforced." It therefore made the publication of "any obscene or licentious matter" in any newspaper or other periodical a statutory misdemeanor, punishable by fine and imprisonment. *See* Laws of Md., 1853, ch. 183.

The prohibition enacted in 1853 was extended in 1886 to cover the drawing, manufacture, production, exhibition, or distribution of any "obscene book, pamphlet, paper-writing, advertisement, circular, print, picture, drawing or other representation, figure or image on or of paper or other material of an indecent or immoral nature. . . ." Laws of Md., 1886, ch. 490. In 1894, the statute was rewritten, without much substantive change; and, except for some amendments not relevant here, the law remained more or less the same until the 1960's.[4]

The word "obscene" was not defined in the statute and thus neither was the precise ambit of the statutory proscription; but that did not appear to have been a significant problem until the Supreme Court decided *Roth v.*

---

**3.** *See* Clark and Marshall, *Law of Crimes,* § 11.10; *Judicial Censorship of Obscene Literature,* 52 Harv.L.Rev. 40 (1938); Model Penal Code and Commentaries (Official Draft and Revised Comments), Part II (1980), § 251.4 (p. 481).

**4.** In 1961, the General Assembly made it a separate crime to distribute obscene material commercially to persons under eighteen years of age (Laws of Md., 1961, ch. 473; *compare* current Md. Ann. Code art. 27, § 419), and also authorized the circuit courts, upon petition of the State's Attorney, to enjoin the distribution of obscene material under certain circumstances (Laws of Md., 1961, ch. 382; current Md. Ann. Code art. 27, § 418A). Neither of these enactments affected the prohibition as rewritten in 1894 (now § 418). In response to *Smith v. California,* 361 U.S. 147 (1959), the General Assembly added the element of *scienter* to § 418 in 1960, requiring that the prohibited actions be "knowingly" done. Laws of Md., 1960, ch. 39.

*United States* and *Alberts v. California,* 354 U.S. 476 (1957), and made it one.[5]

In *Roth* and *Alberts* the Court sustained convictions under the Federal and California obscenity laws, neither of which defined the critical term. In the context of this case, *Roth* did two important things: (1) it stated affirmatively and explicitly that which the Court had in the past merely assumed — "that obscenity is not protected by the freedoms of speech and press" (354 U.S. at 481-85); [6] and (2) it purported to give a Constitutional definition to the word "obscene." The definition, or standard, chosen to determine whether a publication was obscene and thus subject to proscription was "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." 354 U.S. at 489.[7] If the statutory proscription rested upon that standard, said the Court, it did not offend Constitutional safeguards.

In *Monfred v. State,* 226 Md. 312 (1961), *cert. denied,* 368 U.S. 953 (1962), the Court of Appeals adopted and engrafted into the Maryland obscenity statute the *Roth* test — at least, it said (p. 323), "until the Supreme Court specifically speaks further in this uncertain area." *See also Yudkin v. State,* 229

5. In the 104 years from the enactment of the 1853 statute to the decision in *Roth,* only two cases involving the obscenity law reached the Court of Appeals; and both of them concerned the form of indictment rather than the scope or meaning of the prohibition itself. *See Nicholson v. State,* 36 Md. x (Unreported, 1872); *State v. Monfred,* 183 Md. 303 (1944).

6. The Court iterated and reiterated that precept at least three times. At p. 484, it stated that "implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance. This rejection for that reason is mirrored in the universal judgment that obscenity should be restrained. . . ." At p. 485, the Court repeated with emphasis an earlier passage from *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571-72 (1942), that lewd and obscene utterances "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." Following this, also at p. 485, the Court flatly held that "obscenity is not within the area of constitutionally protected speech or press."

7. Rejected by the Court was the test laid down in *Regina v. Hicklin* (1868) L.R. 3 Q.B. 360, which determined whether material was obscene by the effect of isolated passages upon particularly susceptible persons. 354 U.S. at 488-89. Under the *Roth* test, the *entire* work had to be considered in terms of "the average person."

Md. 223 (1962), and *Levin v. State,* 1 Md. App. 139 (1967), *cert. denied,* 247 Md. 740, *cert. denied,* 389 U.S. 1048. The area truly was uncertain. The Supreme Court had a tiger by the tail, and as noted in a comprehensive article in 52 N.Y.U.L. Rev. 810, 820, in the first twenty years since *Roth,* there followed from that Court "no fewer than one hundred signed opinions . . . in twenty-seven cases" dealing with obscenity. The subject of obscenity, remarked Justice Harlan in his dissent in *Interstate Circuit, Inc. v. Dallas,* 390 U.S. 676, 704-05 (1968), "has produced a variety of views among the members of the Court unmatched in any other course of constitutional adjudication." Indeed, he referred to it as the "intractable obscenity problem." *Id.*[8]

Part of what made the problem intractable was the "plurality" Opinion by Justice Brennan (joined only by Chief Justice Warren and Justice Fortas) in *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts,* 383 U.S. 413 (1966) *("Memoirs")* a case involving the burning question of whether the novel *Fanny Hill,* first published in 1749, could legally be banned in Boston in 1965. It was there noted that under the *Roth* definition

"as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is *utterly* without redeeming social value." (Emphasis supplied.) *Id.* at 418.

---

**8.** No less perplexed was Justice Stewart who began to see the task as "trying to define what may be undefinable." *Jacobellis v. Ohio,* 378 U.S. 184, 197 (1964) (Concurring Opinion). Stewart finally concluded that the proscription had to be limited to "hard-core pornography," as to which he said in an oft-quoted statement: "I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it. . . ." *Id.*

*See also Ginzburg v. United States,* 383 U.S. 463 (1966), and *Mishkin v. New York,* 383 U.S. 502 (1966).

Whether prompted by the decision in *Memoirs,* or the general maelstrom into which the obscenity issue then found itself, or some other reason no longer apparent, the General Assembly decided in 1967 "generally to revise the laws of the State pertaining to obscene matter," and thus enacted Laws of 1967, ch. 394, which, with changes not relevant here, is our current statute.

That statute — in particular §§ 418 and 423 — has to be viewed, at least initially, in the light of the then-current law. Although new § 418 substantially rephrased the former section, it did not change the basic proscription against exhibiting and distributing obscene material. Because the legislature again declined to provide a statutory definition of obscenity, however, it left to the courts the task of supplying such a definition and thus circumscribing the scope of the basic prohibition. The statutory proscription, in other words, was as broad as the Supreme Court would allow.[9]

At the time the statute was enacted, the controlling standards were assumed to be those explicated in the Brennan plurality Opinion in *Memoirs,* which standards had previously been applied to the former § 418 in *Donnenberg v. State,* 1 Md. App. 591 (1967). Those standards, as noted, were definitional ones; they served to define the term and thus provide a constitutional perimeter within which § 418 could operate. They did not, however, purport to carve out any constitutional exceptions or exemptions. If the material met the modified *Roth* definition of obscenity, it could be regulated, no matter who was selling or buying it or for what purpose the material was exhibited, distributed, or used.

That presented somewhat of a problem, however, one that

---

**9.** As introduced, the bill did contain a definition of "obscene" — that stated in *Roth* — but it had already become obsolete by virtue of *Memoirs* and was deleted by amendment during the legislative process. In *Lancaster v. State,* 7 Md. App. 602, 604 (1969), we reaffirmed (with respect to the new statute) that "[t]he term 'obscene,' as used in Section 418, was intended by the Legislature to have the same meaning as that constitutionally ascribed to the term by decisions of the Supreme Court of the United States."

both State and Federal courts had wrestled with for many years. Chief Justice Warren alluded to it in his concurring Opinion in *Roth,* when, at p. 495 of 354 U.S., he noted:

"The line dividing the salacious or pornographic from literature or science is not straight and unwavering. Present laws depend largely upon the effect that the materials may have upon those who receive them. It is manifest that the same object may have a different impact, varying according to the part of the community it reached. But there is more to these cases. It is not the book that is on trial; it is a person. *The conduct of the defendant is the central issue, not the obscenity of a book or picture.* The nature of the materials is, of course, relevant as an attribute of the defendant's conduct, but the materials are thus placed in context from which they draw color and character. A wholly different result might be reached in a different setting." (Emphasis supplied.)

Could material be obscene when viewed by the average person, because, to him, applying contemporary community standards, its dominant theme appealed to prurient interest, and yet, in the hands of a scientist studying obscenity, not be obscene because to him it did not appeal to the prurient interest? Or, restated, if such material, meeting all the other criteria for obscenity, could be the proper subject of scholarly investigation and study, could it then be said to be "utterly without redeeming social value" and thus legally obscene?

The dilemma normally arose in the context of attempts by the government (State or Federal) to seize or prevent the importation or mailing of materials it considered to be obscene, *i.e.,* prior censorship as opposed to criminal prosecution. Most of the courts, applying pre-*Memoirs* criteria, recognized the need to distinguish between the pandering of lewd material to the public at large and the reception and use of such material for legitimate research and education purposes; and they usually did so by concluding that, in the hands of researchers, medical personnel, or art collectors,

such material was simply not obscene. *See, for example, United States v. 31 Photographs, Etc.,* 156 F. Supp. 350 (S.D.N.Y. 1957), involving materials ordered by the Institute for Sex Research, Inc. (the "Kinsey" Institute) of Indiana University, and cases cited and reviewed therein; *also People v. Marler,* 199 Cal. App. 2d Supp. 889 (Cal. App. 1962); *but compare United States v. One Unbound Volume, Etc.,* 128 F. Supp. 280 (D. Md. 1955).

That type of reasoning may have been prompted by the fact that the statutes in question purported to apply their sanctions to all obscene material and admitted of no exception therefrom for obscene material used for a "legitimate" purpose. That left the courts no way of making the desired distinction other than in a definitional context. The effect of that, however, was to create a concept of "variable obscenity" — one that judged the obscenity of a publication, at least in part, on the basis of how it was purveyed, to whom it was purveyed, and the purpose for which it was purveyed.[10] This concept was given expression in several different contexts by Justice Brennan in *Memoirs* and the companion cases of *Ginzburg* and *Mishkin.*[11]

In seeming to adopt these various forms of variable obscenity, especially in and after *Memoirs,* the Supreme Court never satisfactorily addressed the question of whether

---

**10.** *See* Lockhart and McClure, *Censorship of Obscenity: The Developing Constitutional Standards,* 45 Minn. L. Rev. 5 (1960).

**11.** In *Memoirs,* 383 U.S. at 420, Brennan noted that if a book had the requisite prurient appeal and was patently offensive, but had only a minimum of social value, "the circumstances of production, sale, and publicity are relevant in determining whether or not the publication or distribution of the book is constitutionally protected." Given the actual holding of the Court — that the book was not obscene — that statement was probably mere *dicta.* In *Ginzburg,* however, Brennan's statement at 383 U.S. 465 that "the question of obscenity may include consideration of the setting in which the publications were presented as an aid to determining the question of obscenity. . ." was more significant, for the "setting" — the manner in which the materials were advertised — was the critical factor used to sustain Ginzburg's conviction. In *Mishkin,* which involved magazines depicting masochistic and bizarre sexual behavior designed for what the Court called "a clearly defined deviant sexual group" (p. 508), the Court said, at p. 509 (of 383 U.S.), "We adjust the prurient-appeal requirement to social realities by permitting the appeal of this type of material to be assessed in terms of the sexual interests of its intended and probable recipient group. . . ."

material could ever be "utterly without redeeming social value" if it had some value in a clinical setting or for purposes of research. One can only assume that the "social value" criterion enunciated by Justice Brennan related to the intrinsic worth of the ideas being communicated in the publication, and not to any indirect value the publication might itself have as an object of study or as a therapeutic device in a clinical program. Otherwise, the variable obscenity concept, seemingly adopted in that trilogy of cases, would be flatly inconsistent with the "social value" standard so clearly expressed in the very same opinions.

Variable obscenity, when so viewed, was one pragmatic answer to a real problem; but it created some vexing problems of its own. Even if one accepts the initial proposition that the same publication can, at the same time, be obscene or not obscene depending upon who is looking at it, there is still the difficulty of regarding that which is otherwise obscene as not obscene when viewed, for example, (1) by a researcher (or those participating in research experiments) whose purpose in viewing it is to study (or assist in the study of) *obscenity* and its effects [12] or (2) by patients in a medically supervised clinic whose purpose in viewing it is to correct sexual dysfunction — *i.e.,* to heighten their sexual appetites and awareness, to appeal to the prurient interest.[13]

Even before *Roth,* this dilemma was the subject of some debate in legal circles, and eventually a way was found around it. The problem, in part, was one of overlapping concepts, of confusing a publication having some intrinsic literary, scientific, or artistic value sufficient to offset its

**12.** *See* Technical Reports of the Commission on Obscenity and Pornography, Government Printing Office (1971); Money and Athanasiou, *Pornography: Review and Bibliographic Annotations,* Amer. Journ. of Obstetrics and Gynecology, Vol. 115, No. 1, pp. 130-46 (1973).

**13.** *See, for example,* Hartman and Fithian, *Treatment of Sexual Dysfunction* (1974), ch. 10; Bjorksten, *Sexually Graphic Material in the Treatment of Sexual Disorders,* in Meyer, *Clinical Management of Sexual Disorders,* pp. 161-94 (1976); Lobitz and LoPiccolo, *New Methods in the Behavioral Treatment of Sexual Dysfunction,* in Fischer and Gochros, *Handbook of Behavior Therapy with Sexual Problems,* Vol. 1, pp. 7-14 (1977).

prurient appeal with one not having such offsetting intrinsic value but which might be the subject of legitimate study or clinical use, and thus become clothed with an extrinsic value for that limited purpose.

The solution, devised or adopted by the draftsmen of the Model Penal Code, was to regard the first type of publication as simply not being obscene in the first instance, which is how the courts tended to regard it,[14] and to consider the second type as possibly falling within the proper definition of obscenity but nevertheless deserving of protection when used for legitimate research or clinical purposes. This was done by (1) adopting as a definitional condition of obscenity that the *predominant* appeal be to the prurient interest, thus recognizing "that a work of art or literature may contain elements of prurient interest that are subordinate to the positive values of the work"; [15] and (2) providing that "[i]t is an affirmative defense to prosecution . . . that dissemination was restricted to: (a) institutions or persons having scientific, educational, governmental or other similar justification *for possessing obscene material;* or (b) noncommercial dissemination to personal associates of the actor." (Emphasis supplied.) See § 251.4 (3), Model Penal Code.

The intent behind this approach is made clear in the A.L.I. comments to § 251.4 (3). Comment 9 (p. 501) states, in relevant part:

> "Psychologists, sociologists, anthropologists, and students of art and literature must not be barred from access to relevant materials merely because they may appeal to prurient interest. *It seemed better to face this problem realistically by way of explicit exemption, rather than to twist the definition of obscenity so as to reach the correct result by describing obviously pornographic materials as*

---

**14.** *See* Lockhart and McClure, *Literature, The Law of Obscenity and the Constitution,* 38 Minn. L. Rev. 295 (1954).
**15.** Model Penal Code and Commentaries, *supra,* note 7, p. 492.

*not 'obscene' if in the hands of an artist or scientific researcher."* (Emphasis supplied.)

Section 251.4 of the Model Penal Code was first published as part of Tentative Draft No. 6 in May, 1957. It was finally approved by the American Law Institute in May, 1962, and soon thereafter parts of it began to be adopted, in one form or another, by a number of State legislatures. In particular, one finds the approach taken in § 251.4 (3) — of exempting material in the hands of researchers and clinicians from criminality rather than from the definition of obscenity — embodied in many (if not most) of the State obscenity statutes currently in force.[16]

There is no uniformity among the States in the wording of the exemption. Some, for example, couch it as an "affirmative defense," [17] as does the Model Penal Code, while others (like Maryland) speak in terms of an exemption.[18] Some States frame the exemption in terms of the particular types of institutions permitted to acquire, possess, and use obscene material — libraries, museums, schools, etc. — without specific regard to purpose; [19] most, however, tie the exemption to the purpose of the acquisition and use and not

---

**16.** *See, for example,* Cal. Penal Code § 311.8 (Deering); Conn. Gen. Stat. Ann. § 53a-195; Del. Code tit. 11, § 1362 (1); D.C. Code § 22-2001 (c); Ga. Code § 26-9905a (c); Idaho Code § 18-4102; Ill. Ann. Stat. ch. 38, § 11-20 (f) (Smith-Hurd); Kan. Stat. § 21-4301 (3) (1980 Supp.); Ky. Rev. Stat. Ann. § 531.070 (Baldwin); 9A La. Rev. Stat. Ann. § 14-106 (D) (1981 Supp.); Me. Rev. Stat. tit. 17, § 2911.2.A; Mass. Ann. Laws ch. 272, § 29; Mich. Comp. Laws § 722.676; Minn. Stat. § 617.295 (a) (1981 Supp.); Neb. Rev. Stat. § 28-815 (1); N.H. Rev. Stat. Ann. § 650:4; N.M. Stat. Ann. § 30-37-5(D); N.Y. Penal Law § 235.15 (Consol.); N.C. Gen. Stat. § 14-190.10 (c) (1); N.D. Cent. Code § 12.1-27.1-11; Ohio Rev. Code Ann. § 2907.32.1 (B) (Anderson); Okla. Stat. tit. 21, § 1021.1 (1980 Supp.); Or. Rev. Stat. § 167.085 (2); Pa. Stat. Ann. tit. 18, § 5903 (j); S.D. Compiled Laws Ann. § 22-24-31 (4); Tenn. Code Ann. § 39-3016 (1980 Supp.); Tex. Penal Code Ann. tit. 9. § 43.23 (1980 Supp.) (Vernon); Wash. Rev. Code § 9.68.100.

**17.** *See, for example,* the California. Delaware, D.C., and Illinois Codes, *supra,* n. 16.

**18.** *See* Pennsylvania Code, *supra,* n. 16. Except possibly in determining who has the burden of proof on the issue (*see Mackall v. State,* 283 Md. 100 (1978)), we see no significant distinction between stating the caveat as an exemption from criminality as opposed to an affirmative defense to a criminal prosecution.

**19.** *See* Louisiana, Maine, Massachusetts, Minnesota, Nebraska, North Carolina, Pennsylvania, and Washington Codes, *supra.* n. 16.

expressly to the nature or status of the acquirer or user. These latter States (like Maryland) speak in terms of scientific, educational, and occasionally governmental purposes.[20] Although the precise wording is different in nearly every case, the general purpose and effect of these provisions is similar; it is to adopt the approach taken in the Model Penal Code, as explained in Comment 9, *supra.*[21]

There can be little doubt, from its very wording, that our § 423, as enacted in 1967, was taken from § 251.4 (3) of the Model Penal Code, and was intended to serve the same purpose. No other construction would appear to be warranted or reasonable.

Since the enactment of § 423, there has, of course, been a major shift in the constitutional definition of obscenity. In *Miller v. California,* 413 U.S. 15 (1973), and four companion cases,[22] the Supreme Court formally abandoned the three-stage *Memoirs* test, which the Court found had created a burden "virtually impossible to discharge." *Id.* at p. 22. In its place, the Court fashioned a new [23] tripartite test. The critical language appears at pp. 23-24:

> "State statutes designed to regulate obscene materials must be carefully limited. . . . As a result, we now confine the permissible scope of such regulations to works which depict or describe sexual conduct. That conduct must be specifically defined

---

**20.** *See* Connecticut, Delaware, D. C., Georgia, Idaho, Illinois, Kansas, Kentucky, New Hampshire, New Mexico, New York, Ohio, Oklahoma, Oregon, South Dakota, Tennessee, Utah, and Vermont Codes, *supra*, n. 16.

**21.** Comments in the Illinois Code make this especially clear. The Illinois law, as noted, provides an affirmative defense for dissemination to "institutions or individuals having scientific or other special justification for possession of such material." The Committee Comment to that provision states that it is "simply a recognition that police, social scientists, educational institutions, and other authorities may have a legitimate need to possess obscene material."

**22.** *Paris Adult Theatre I v. Slaton,* 413 U.S. 49 (1973); *Kaplan v. California,* 413 U.S. 115 (1973); *United States v. 12 200-Ft. Reels of Super 8MM. Film,* 413 U.S. 123 (1973); *United States v. Orito,* 413 U.S. 139 (1973).

**23.** Part of the new test, as is evident by a simple comparison, is essentially a rephrasing of *Roth-Memoirs.* The primary thrust seems to be in the substitution of whether the work lacks serious literary, artistic, political, or scientific value or whether it is utterly without redeeming social value.

by the applicable state law, as written or authoritatively construed. A state offense must also be limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value.

"The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, . . . (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. . . ." (Citations omitted; footnote omitted.)

Having thus stated the test in conceptual terms, the Court gave "a few plain examples of what a state statute could define for regulation"; namely: "(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated" and "(b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." *Id.* Thus, said the Court at p. 27, "[u]nder the holdings announced today, no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct specifically defined by the regulating state law, *as written or construed."* (Emphasis supplied.)

This new test, set forth in *Miller,* was first adopted by this Court in the context of Md. Ann. Code art. 66A (providing for the advance licensing — *i.e.,* censorship — of motion pictures) in *Ebert v. Maryland State Board of Censors,* 19 Md. App. 300 (1973). In *Village Books, Inc. v. State,* 22 Md. App. 274 (1974), *cert. denied,* 273 Md. 723, we specifically adopted it (as further explicated by the Supreme Court in *Hamling v. United States,* 418 U.S. 87 (1974), and *Jenkins v.*

*Georgia,* 418 U.S. 153 (1974)) as controlling the scope of art. 27, § 418 as well. That, we think, serves to meet the *Miller* requirement that the State statute, as written or construed, specifically define the proscribed conduct. *See Ward v. Illinois,* 431 U.S. 767 (1977); *Star v. Preller,* 375 F. Supp. 1093 (D. Md. 1974), *aff'd,* 419 U.S. 956.[24] The "obscene matter" proscribed by § 418 is precisely that which the *Miller-Hamling-Jenkins* Courts said may constitutionally be proscribed — no more and no less.

Although Miller clearly controls the scope of § 418 in terms of defining what is obscene, it has no direct impact on § 423. *Miller* does not reintroduce the concept of variable obscenity, as suggested by appellants; it does not necessarily equate the definitional criterion of literary, artistic, political, or scientific value with the usability of material for scientific, educational, or governmental purposes. To conclude otherwise, in view of the usability of even "hard core" pornography for research, teaching,[25] and clinical purposes, would be tantamount to saying that nothing is legally obscene — that there is no such thing as proscribable obscenity. And that, most certainly, has never been the position of the Supreme Court.

In the companion case of *Paris Adult Theatre I v. Slaton, supra,* 413 U.S. 49, 69, the Court made clear that its holdings were directed "not at thoughts or speech, but at depiction and description of specifically defined sexual conduct that States may regulate within limits designed to prevent infringement of First Amendment rights." It was the "commerce in obscene material," the "exhibition of obscene material in places of public accommodation" that was unprotected by the Constitution and thus subject to regu-

---

**24.** *Compare Obscenity '73: Something Old, A Little Bit New, Quite a Bit Borrowed, But Nothing Blue,* 33 Md. L. Rev. 421, 452-53 (1973), written prior to our *Village Books, Inc.,* in which the author concluded that § 418, in light of its then-current judicial interpretation, was "lacking the specificity required by the *Miller* Court."

**25.** *See, for example,* Vandervoort and McIlvenna, *Sexually Explicit Media in Medical School Curricula,* in Green, *Human Sexuality; A Health Practitioner's Text,* pp. 235-44 (1975); and in general, a bibliography entitled *Professional Use of Erotica (Bibliotherapy)* published by the Institute for Sex Research, Indiana University.

lation. *See also Kaplan v. California, supra,* 413 U.S. 115, 120: *Paris Adult Theatre I* "reaffirms that commercial exposure and sale of obscene materials *to anyone,* including consenting adults, is subject to state regulation." (Emphasis supplied.)

From these expressions, and indeed from the entire thrust of *Miller,* we think it clear that the exemption from criminality stated in § 423 in no way renders the general proscription of § 418 nugatory. It does not eradicate or annul the concept or definition of obscenity or Maryland's power to regulate that obscenity. Section 423 under *Miller* has the same function as it did before *Miller:* it "permits" *obscene material* to be used for certain specified purposes.

We turn then to the question of whether § 423 carries out that function in a constitutional manner, specifically, whether it creates arbitrary or capricious classifications. Appellants' contention that it has that effect is based upon their construing the exemptions as applying only to "formal" or "certified" educators, students, or scientists, which discriminates against those who seek such material for their own personal education.

In *Wheeler v. State,* 281 Md. 593, 602 (1977), the Court of Appeals observed that, because obscenity is unprotected by the First Amendment, the exemptions from criminality under the State obscenity law involve "neither a suspect class nor a fundamental right." The test to be applied in viewing an "equal protection" claim, therefore, is the "reasonable basis" or "rational relationship" one; *i.e.,* the legislative classification "must be sustained unless it is 'patently arbitrary' and bears no rational relationship to a legitimate governmental interest." *Id.*

As we have noted throughout, it has long been recognized, first by the courts, then by legislative bodies, that obscene material of a type that is constitutionally subject to regulation by the State ought to and may be permitted for *bona fide* educational and scientific purposes, in a variety of research and clinical settings. Use of the material for those purposes provides a certain social utility to it that it does not

otherwise possess; that infusion of external utility, indeed, is all that justifies the use of the material in those circumstances.

We have no difficulty in concluding that the statutory exemption for persons having *bona fide* scientific, educational, governmental, or other similar justification for possessing obscene material does not serve to contravene the "equal protection" clause of the Fourteenth Amendment. Those are reasonable classifications, sufficiently well defined, and bear a rational relationship to a legitimate governmental interest. *See Sanza v. Maryland State Board of Censors,* 245 Md. 319, 341 (1967), sustaining the validity of similar exemptions under Art. 66A of the Code; *Star v. Preller,* 352 F. Supp. 530 (D. Md. 1972), *remanded,* 413 U.S. 905 in light of *Miller v. California and reaffirmed,* 375 F. Supp. 1093 (1974), *aff'd,* 419 U.S. 956; *also State v. Starr Enterprises, Inc.,* 597 P.2d 1098 (Kan. 1979); *State v. Next Door Cinema Corp.,* 587 P.2d 326 (Kan. 1978); and *People v. Illardo,* 423 N.Y.S.2d 470 (1979); and *cf. Modern Social Education, Inc. v. Preller,* 353 F. Supp. 173 (D. Md. 1973), *aff'd in part, rev'd in part (on other grounds),* 512 F.2d 1241 (4th Cir. 1975).[26]

Finally, we turn to the question of whether appellants' activities were covered by the § 423 exemptions. Because this issue is a mixed one of fact and law and will thus require some initial findings by the trial court, we shall do no more than state what we consider to be the controlling legal principles, leaving it to the trial court on remand to determine their particular application.

The primary focus under § 423 is on the actions of *appel-*

---

**26.** In responding to appellants' "equal protection" argument, we have assumed that they have standing to raise it in light of the record in this case. This is an assumption, not a determination. *Compare Matter of Trader,* 272 Md. 364 (1974).

There may, perhaps, come a point where the use of pornographic material in an educational or therapeutic setting becomes so widespread and unstructured in terms of the general population that the statutory classifications created in § 423 could lose their rationality. In that circumstance, a significant "equal protection" problem would arise. The record in this case, however, does not reveal that we have yet reached that point or that we necessarily ever will.

*lants,* not their customers. That among the general traffic patronizing their emporia may be an occasional researcher, educator, or clinician searching for material *he or she* intends to use for a protected purpose does not require a finding that *appellants* are possessing, exhibiting, and disseminating their wares for such a purpose. At best, § 423 might protect those particular disseminations, but not the general possession, exhibition, and offering for sale of the material in the store.

The mere posting around a store located in an "adult entertainment" area, catering to such of the general public as visit that area, and loaded primarily with pornographic material, of signs indicating that everything in the store is sold only for scientific, educational, or governmental purposes hardly suffices to make § 423 applicable as a matter of law. It is no different than the situation of a liquor store defending against a charge of selling to minors by posting signs stating that liquor is not sold to minors, or by signs declaring that all customers are adults, whether in fact they are. One cannot legitimate that which is illegitimate merely by calling it legitimate.

Appellants place considerable reliance on *People v. Wrench,* 371 N.Y.S.2d 833 (Dist. Ct. 1975), a *nisi prius* decision of the District Court of Suffolk County, New York. *Wrench* involved an ordinary bookstore located in a shopping center. In the front, it sold everything "from light fiction to cook books" (371 N.Y.S.2d at 835); in "a separate rear section, physically separated from the rest of the bookstore by walls and a door" was displayed "adult material." *Id.* Signs restricted access to the rear portion to persons over twenty-one; also posted were the types of signs placed in appellants' stores. A police officer went to the rear part of the store, which had a separate cash register, and purchased a magazine alleged to be obscene.

On those facts, the Suffolk County District Court concluded that the defendant had established the affirmative defense of disseminating the magazine to a person having a "governmental or similar justification for pos-

sessing or viewing same" — the New York counterpart to our § 423.

*People v. Wrench* is not persausive authority to us. Aside from some obvious differences in the factual setting, the holding in that case does not represent the definitive law of New York, and we do not accept as valid the reasoning upon which it rested. *See People v. Martin,* 420 N.Y.S.2d 318 (Supreme Ct. 1979); *People v. Illardo,* 411 N.Y.S.2d 142 (County Ct. 1978), *aff'd,* 423 N.Y.S.2d 470 (1979).

The question is one of fact, which will have to be determined by the trial court.

> *Judgments reversed and remanded for retrial; appellants to pay the costs of record extract; Mayor and City Council of Baltimore to pay all other costs.*[27]

---

27. Appellants printed and filed a record extract, which is not required in criminal appeals. *See* Maryland Rule 1028. Notwithstanding their ultimate success in this appeal, it would be unjust to charge the City with the cost of that record extract.