[No. C041318. Third Dist. Mar. 8, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
HEATH DANIEL WOODWARD, Defendant and Appellant.

822

824

**COUNSEL**

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, Stan Cross and Susan J. Orton, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BUTZ, J.**—Defendant Heath Daniel Woodward was charged with two counts of forcible lewd conduct with a child under the age of 14 (Pen. Code, § 288, subd. (b)(1))[1] and one count of possessing material depicting a minor engaged in sexual conduct or simulated sexual conduct (child pornography), a misdemeanor (§ 311.11, subd. (a)).[2] A jury found the defendant not guilty of both forcible lewd conduct charges, but guilty of a lesser included charge of lewd conduct (§ 288, subd. (a)) and possessing child pornography (§ 311.11, subd. (a)). Defendant was sentenced to the upper term of eight years in state prison for lewd conduct, to be followed by one year in county jail for possessing child pornography.

On appeal, defendant contends (1) the exclusion of evidence of the child victim's other sexual contacts was reversible error, and (2) the trial court's erroneous instruction on the affirmative defense to child pornography possession violated due process principles. We discern no prejudicial error, and shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

We state the facts in favor of the judgment.

### A. *Prosecution Case*

K.Z. and defendant were married in 1992, and had two children, a developmentally disabled boy born in 1992 (hereafter A.), and a girl born in 1993 (hereafter B.). Defendant and K.Z. separated in 1995 and were divorced in 1997, with the agreement that K.Z. would have custody of the children for four years, until 2001, and defendant would have custody for the next four years. K.Z. moved from Sacramento to South Dakota in July 1998.

In September 2000, K.Z. planned to marry a Canadian, S.L., and move to Canada. In late September or early October, she made arrangements to fly

---

[1] Undesignated statutory references are to the California Penal Code; undesignated statutory references from other states are as indicated.

[2] Section 311.11, subdivision (a) provides in pertinent part: "Every person who knowingly possesses or controls any matter, representation of information, data, or image, including, but not limited to, any film, filmstrip, photograph, negative, slide, photocopy, videotape, video laser disc, computer hardware, computer software, computer floppy disc, data storage media, CD-ROM, or computer-generated equipment or any other computer-generated image that contains or incorporates in any manner, any film or filmstrip, the production of which involves the use of a person under the age of 18 years, knowing that the matter depicts a person under the age of 18 years personally engaging in or simulating sexual conduct, . . . is guilty of a public offense."

back to California over Thanksgiving with her fiance and the children. K.Z. testified she left defendant two voice mail messages before November. K.Z. attempted to e-mail defendant, but her message was returned. On her fourth attempt during the first week of November, she was able to talk to defendant on the telephone about a visit with the children. Defendant stated he was not sure of his schedule. He called her back during the second week of November, agreeing to see the children.

K.Z. and her fiance left the children with her parents at a motel in Sacramento on Friday, November 24, 2000. Defendant was to pick them up there after work. The children spent Friday night with defendant at his apartment.

B., eight years old at trial, testified she sat on defendant's lap while watching television. Defendant touched her "private part" with his hands, and asked her if she liked it. After that, B. took a bath and shower. Defendant got in the shower with her. She washed his private part with soap. B. did not remember whether defendant's penis was soft and squishy or hard. She and her brother went to sleep and returned to the motel on Saturday.

B.'s grandmother, who did not want defendant to have custody of the children, asked B. whether she wished S.L. or defendant to be her father. B. said she wanted S.L. to be her father because defendant touched her private places. The grandmother told K.Z. what B. had said, and B. repeated it to her. K.Z. called the police.

That day, B. told Sheriff's Deputy Rhea Pelster that defendant touched her private parts. B. said defendant had her wash his "private parts" in the shower when it was "standing up," and asked her to keep it a secret. Deputy Pelster rotated a pen during the interview, and B. pushed the pen up to demonstrate the angle of the defendant's apparent erection.

Later that evening, Deputy Pelster and other officers went to defendant's apartment to arrest him. The officers found two computers, one with a 19-inch monitor displaying a naked female juvenile with a dildo being inserted in her vaginal canal and a list of file names on the left-hand side, which included incest topics.

Defendant told police he had been doing Internet research into incest, bestiality, and rape to assist his girlfriend. He had accumulated around 300 megabytes of incest stories and videos. Defendant used two e-mail names, "Domlyone" and "Cyber Puppy." Defendant admitted he had tickled B., "possibly touch[ing] her in her privates," and had taken a shower with her. He stated he was not aroused in the shower, and only had B. wash his feet,

his shoulders, and his back. Defendant told Deputy Pelster that getting into the shower with B. was "probably going to kill me, isn't it?" He stated he would not do "something like that" to his daughter.

A forensic computer expert examined the computer hard drives in defendant's desktop and laptop computers and CD's. The expert testified that he discovered e-mails, dated folders of images of children "engaged in sex acts," including movies, and recordable CD's. Images of children, e-mails, chat logs, and an Internet history were introduced at trial. Various images were played for the jury. It was stipulated that all the females depicted in the images shown to the jury were under the age of 18. Computer records showed defendant sent out an e-mail on October 6, 2000, stating he was thinking of having sex with his daughter. On the night of B.'s visit, defendant went to a pictorial Web site involving incest with girls. No textbooks, notes, or research materials were found in his apartment.

On December 13, 2000, B. was interviewed at the Multidiscipline Interview Center (MDIC).[3] In the interview, B. stated she washed defendant's front "private" in the shower, and it was soft and squishy.

## B. *Defense Case*

Nicole S., who lived with defendant and K.Z. between 1993 and 1995, explained she introduced defendant to "discipline" and "master-slave" relationships. She testified defendant never had child pornography on his computer and that defendant always acted appropriately with B.

Tyla A., Nicole's current roommate, met Nicole and defendant online in 1999. In 2000, she lived with defendant along with her two daughters, ages 8 and 9. She joined the lifestyle of "dominance and submission." She was aware that defendant visited bestiality Web sites, but defendant always behaved appropriately with her daughters and she entrusted them to stay overnight with him by themselves.

Pam L. met defendant online in 1999 while living in Indiana. Pam has multiple personalities. Defendant first visited her in Indiana in February 2000. Pam visited defendant in California in April 2000, at which time Pam and defendant began a dominant/submissive lifestyle.

Beginning in December 1999, Pam told defendant about her childhood sexual abuse involving incest and bestiality. Pam began counseling and

---

[3] A videotape of the interview was played for the jury. The jury was provided with transcripts of the interview.

defendant attended counseling once with her in July 2000. Pam did not begin regular counseling until November to December 2000. She asked defendant to help her by doing research. Defendant showed Pam hundreds of child pornography pictures and had her write violent stories involving the abuse of children. She asked defendant to download this material because when she attempted to do so, her other personalities emerged. Pam conceded her therapists never suggested she view such images. Pam watched defendant interact with her 13-year-old daughter and believed he was honest and not inappropriate.

Nicole, Tyla, and Pam were aware that defendant had allegedly molested two seven- or eight-year-old girls when he was 14 years old. Defendant testified the touching was accidental.

Defendant testified on his own behalf. Defendant acknowledged he created "junk e-mail" files identified as child pornography as early as 1998 and 1999. In January or February 2000, Pam asked him to assist her in doing research. Defendant sought information through an Internet search engine, but never went to a library, bookstore, or university, and never called any abuse-related agencies.

Defendant admitted sending out an e-mail to an Internet chat room on October 6, 2000, which read, "I'm thinking about having sex with my daughter." He testified that this was before he knew he would be seeing his daughter in November and that the purpose of the e-mail was to "solicit a response from . . . people who were currently in an incestuous lifestyle . . . to get more understanding as to what people—what started people in the incest, why they did it, what they got out of it, and who was involved."

On November 5, 2000, the same day he learned that K.Z. was bringing the children to California for the Thanksgiving weekend, defendant participated in a cyber sex chat with a partner who played his daughter and pretended to be 14.

On Friday, November 24, 2000, during the Thanksgiving visit, defendant tickled and wrestled with his children. That evening, defendant gave B. a bath, and decided to get in the shower with her. Defendant denied inappropriate touching of B. or having her touch him. He testified at trial that he was not aroused in the shower, although he initially told Deputy Pelster, "I don't believe I was aroused while in the shower with [B.]."

After B. went to sleep, defendant continued incest research on his computer for more than an hour.

Defendant conceded he had no training and did no formal research work into sexual assaults. He did have 387 downloaded files on one CD, which he organized as to sex and parental individual involved. Defendant downloaded stories and images, not academic research or papers.

Darren Mann, defendant's former coworker, gave defendant his abnormal psychology textbook in July 2000, and suggested defendant talk with his professor from college, in order to assist defendant with helping his girlfriend. Mann had acquired the textbook eight years before when he was a student at Sacramento State University.

## DISCUSSION

### I.

Defendant contends the trial court erred by excluding evidence of B.'s prior "sexual contacts" because the acts were relevant to B.'s "knowledge" of an erect penis. Defendant argues that whether he had an erection when taking a shower with B. was a material fact, permitting the prosecutor to argue that B. knew of an erect penis from defendant's conduct. We conclude the trial court did not abuse its discretion in excluding evidence of the prior contacts.

### A. *Background*

#### 1. *Pretrial Motion.*

Defendant filed a written motion seeking to present evidence of three prior incidents under Evidence Code section 782,[4] but presented no theory of the relevance of the acts.

---

[4] Evidence Code section 782 provides, in relevant part:

"(a) In any prosecution under Section . . . 288 . . . of the Penal Code, . . . if evidence of sexual conduct of the complaining witness is offered to attack the credibility of the complaining witness under Section 780, the following procedure shall be followed:

"(1) A written motion shall be made by the defendant to the court and prosecutor stating that the defense has an offer of proof of the relevancy of evidence of the sexual conduct of the complaining witness proposed to be presented and its relevancy in attacking the credibility of the complaining witness.

"(2) The written motion shall be accompanied by an affidavit in which the offer of proof shall be stated.

"(3) If the court finds that the offer of proof is sufficient, the court shall order a hearing out of the presence of the jury, if any, and at the hearing allow the questioning of the complaining witness regarding the offer of proof made by the defendant.

"(4) At the conclusion of the hearing, if the court finds that evidence proposed to be offered by the defendant regarding the sexual conduct of the complaining witness is relevant pursuant to Section 780, and is not inadmissible pursuant to Section 352 of this code, the court may

In the first incident, in 1996, two-and-one-half-year-old B. was molested by an adult babysitter, who admitted he orally copulated her and ejaculated on sweat pants. B.'s anus had two superficial lacerations from slight digital penetration. He used his finger to penetrate her. Her hands were bound and she was blindfolded.

In the second incident, in the summer of 1998, four-and-one-half-year-old B. put her hand around another little girl at day care and put her hands inside the waistband of the girl's shorts.

In the third incident, in June 2000, six-and-one-half-year-old B. and a six-year-old boy were found underneath a bed, fully clothed. The little boy was lying on top of B. The children said they were "sexing" because they loved each other.

The trial court ruled the first two incidents were not relevant because they were completely dissimilar from the acts alleged in the current case.

However, the trial court ruled there was potential relevance to the third incident and sought further testimony. Trial counsel stated the relevance was that B. had undergone counseling after the second and third incidents, as well as actual touchings. Outside the presence of the jury, K.Z. testified that B. was placed in counseling after the second (day care) incident, and that she saw no actual "hand-to-vaginal" touching between B. and the little boy.

The trial court ruled the third incident was completely dissimilar to the charged crime, as required for admission under Evidence Code section 782, and would be confusing to the jury under Evidence Code section 352.[5] Trial counsel then argued the fact that the victim attended *counseling* after the incident made her more likely to "over-report" behavior. The court responded: "So I'm going to exercise my discretion under Evidence Code section[s] 782 and 352 and exclude questioning and evidence of the prior acts."

## 2. *Midtrial Disclosure.*

Following the close of the prosecution's case, another sexually related incident was disclosed. K.Z. admitted making a 1996 report to children's

make an order stating what evidence may be introduced by the defendant, and the nature of the questions to be permitted. The defendant may then offer evidence pursuant to the order of the court."

[5] Evidence Code section 352 provides the trial court with discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

protective services. She saw two-year-old B. using a pencil, poking the eraser end toward her vaginal area. B. told K.Z. somebody on the church van did that to her.

Defense counsel moved for a mistrial for failure to disclose the incident and argued it was admissible as a prior act. The trial court ruled the incident was completely dissimilar to the charged crime under Evidence Code section 782.

## B. *Analysis*

■ Evidence of prior sexual activity of a crime victim is generally excluded. (Evid. Code, § 1103, subd. (c)(1); see 1 Witkin, Cal. Evidence (4th ed. 2000) Circumstantial Evidence, § 61, pp. 394–395.) A limited exception to these general rules exists for prior molestation incidents involving child victims. (Evid. Code, § 782.) The theory behind the admission of a molestation victim's prior molestation is that a child would not have knowledge of certain sexual practices other than as a result of the prior molestation.

In *People v. Daggett* (1990) 225 Cal.App.3d 751 [275 Cal.Rptr. 287] (distinguished on other grounds in *People v. Lawley* (2002) 27 Cal.4th 102, 156 [115 Cal.Rptr.2d 614, 38 P.3d 461]), the appellate court permitted the introduction of the child's prior victimization, which included oral copulation and sodomy. "A child's testimony in a molestation case involving oral copulation and sodomy can be given an aura of veracity by his accurate description of the acts. This is because knowledge of such acts may be unexpected in a child who had not been subjected to them. In such a case it is relevant for the defendant to show that the complaining witness had been subjected to similar acts by others in order to cast doubt upon the conclusion that the child must have learned of these acts through the defendant. Thus, if the acts involved in the prior molestation are *similar to the acts of which the defendant stands accused,* evidence of the prior molestation is relevant to the credibility of the complaining witness and should be admitted." (*Daggett,* at p. 757, italics added.)

Defendant now argues the prior acts were relevant to impeach B.'s description of defendant's erection given to Deputy Pelster. Exclusion of evidence of prior exposure to an erection created a "false aura of veracity because a six-year-old child's knowledge of an erect penis would be unexpected unless the child had been subjected to lewd conduct with sexually lustful intent." Defendant claims this was a material fact, because whether defendant had an erection in the shower was circumstantial evidence of his criminal intent.

We conclude the trial court did not abuse its discretion in excluding the evidence. First, defendant has waived the issue because he did not argue the knowledge of an erection as a theory of relevance in the trial court. Under these circumstances, defendant may not claim the evidence was erroneously excluded. (Evid. Code, § 354; *People v. Ramos* (1997) 15 Cal.4th 1133, 1179 [64 Cal.Rptr.2d 892, 938 P.2d 950].)

Second, the prior sexual contacts were dissimilar to the charged crimes. In the first incident, although there was apparently ejaculation, the two-year-old victim was blindfolded and the contact was oral and digital. The second incident did not involve lewd conduct by a male. The third incident had no genital exposure. The incident disclosed midtrial, involving a pencil, arguably bears some similarity to the officer's use of a pen in questioning B., but is not similar to the charged lewd conduct.

Third, even if the incidents were relevant, the trial court did not abuse its discretion in excluding the evidence of the first three incidents as more prejudicial than probative under Evidence Code section 352. (*People v. Smithey* (1999) 20 Cal.4th 936, 970 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) "Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125 [36 Cal.Rptr.2d 235, 885 P.2d 1].)

It is clear the trial court examined both the documentary offers and testimony of K.Z. Because the relevance of the prior incidents was so minimal and the risk of confusing the jury so palpable, the trial court did not abuse its discretion in excluding these incidents.

## II.

Defendant contends the prosecution's special instruction defining the affirmative defense to child pornography possession set forth in section 311.8 was fundamentally unfair, violated the due process clause, and had a substantial and injurious influence. Defendant argues the trial court should have instructed the jury with the simple statutory language of section 311.8, rather than including dicta from a case that predated the adoption of the statute. We agree the instruction was erroneous but conclude that the error was not prejudicial.

Section 311.8, subdivision (a), provides: "It shall be a defense in any prosecution for a violation of this chapter that the act charged was committed in aid of legitimate scientific or educational purposes." (Added by Stats. 1961, ch. 2147, § 5, p. 4428.)[6]

The prosecutor proposed an instruction adding language drawn from the opinion in *People v. Marler* (1962) 199 Cal.App.2dSupp. 889 [18 Cal.Rptr. 923] (*Marler*):

"It is a defense to the crime charged in [c]ount 3, if you find that the defendant committed those acts in the aid of legitimate scientific or educational purposes. In determining whether child pornography is possessed in aid of legitimate scientific or educational purposes, the jury may consider, but is not limited to, any of the following:

"1. Was the child pornography used in good faith exclusively within a scientific or educational group pursuing a professional purpose and was it germane to that purpose?

"2. Was the child pornography likely to fall into the hands of others not connected to the scientific or educational purpose?

"3. Was the child pornography likely to appeal to the prurient interests of the average person within the scientific or educational group?"[7]

Trial counsel objected to the instruction, acknowledging the statute was added in 1961 and the *Marler* case was issued in 1962, as "background on the legislative history of the code section." The prosecutor stated the *Marler* case was the only statement on the affirmative defense, and set "some formal standards" for its uses.

The trial court stated that section 311.8 did not confer a "blanket defense" and commented: "Instead, the Court believes that if the Legislature intended to narrow the defense to only good faith, scientific, or educational pursuits, and having read the [*Marler*] case several times, considering what language should be used, the Court is satisfied that the language they'll instruct the jury on is consistent with current existing law, and I'm going to give that instruction as well." The trial court gave the instruction.

---

[6] References in this opinion to section 311.8 are to the defense set forth in subdivision (a) of the statute. The defense set forth in section 311.8, subdivision (b) (distribution of obscene matter by telephone) does not apply to the facts of this case.

[7] *Marler* is a dissemination case involving the lending or giving away of obscene films. (*Marler, supra,* 199 Cal.App.2d at p. Supp. 891.) It actually uses the term "legitimate professional purposes." (*Id.* at p. Supp. 894.)

## A. *General Principles*

"In deciding whether an instruction is erroneous, we ascertain at the threshold what the relevant law provides. We next determine what meaning the charge conveys in this regard. Here the question is, how would a reasonable juror understand the instruction. [Citation.] In addressing this question, we consider the specific language under challenge and, if necessary, the charge in its entirety. [Citation.] Finally, we determine whether the instruction, so understood, states the applicable law correctly." (*People v. Warren* (1988) 45 Cal.3d 471, 487 [247 Cal.Rptr. 172, 754 P.2d 218].)

■ The trial court has a duty to instruct on all applicable principles of law, including defenses. The right to present a defense is a component of the federal guarantee of due process of law. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, *Chambers v. Mississippi* [(1973) 410 U.S. 284, 302 [35 L.Ed.2d 297, 312–313, 93 S.Ct. 1038]], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' [Citations.]" (*Crane v. Kentucky* (1986) 476 U.S. 683, 690 [90 L.Ed.2d 636, 645, 106 S.Ct. 2142].)

■ The trial court should give amplifying or clarifying instructions when the terms used in an instruction " 'have a "technical meaning peculiar to the law." ' " (*People v. Valenzuela* (1985) 175 Cal.App.3d 381, 393 [222 Cal.Rptr. 405], overruled on other grounds in *People v. Flood* (1998) 18 Cal.4th 470, 484, 490, fn. 12 [76 Cal.Rptr.2d 180, 957 P.2d 869]; *People v. Richie* (1994) 28 Cal.App.4th 1347, 1360 [34 Cal.Rptr.2d 200].) If a word is " 'commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request.' " (*People v. Rowland* (1992) 4 Cal.4th 238, 270–271 [14 Cal.Rptr.2d 377, 841 P.2d 897].)

In this case, the amplifying instruction was given at the prosecution's request, over objection, not in response to an inquiry. In order to determine whether this instruction was erroneous, it is necessary to examine the current state of the law concerning what is usually termed the "scientific research defense" to obscenity possession. (See discussion in *400 E. Baltimore St., Inc. v. State* (1981) 49 Md.App. 147 [431 A.2d 682, 690–692] (*400 E. Baltimore*).)

## B. *Historical Background*

Comprehensive obscenity law has existed since the 19th century, as described by Justice Frankfurter in his dissent in *Winters v. New York* (1948)

333 U.S. 507, 520–523 [92 L.Ed. 840, 852–854, 68 S.Ct. 665]. (See Model Pen. Code & Commentaries, com. to § 251.4, pp. 482–486.) However, statutory exemptions from criminal prosecution for possessing obscenities appear to have arisen during the 1950's with the American Law Institute's drafting of the Model Penal Code's section on obscenity. (*Id.*, at pp. 479–523; *400 E. Baltimore, supra,* 431 A.2d at pp. 691–692; see also Annot., Obscenity Prosecutions (1993) 13 A.L.R.5th 567, 576.)

In 1957, a federal district court in New York City decided *United States v. 31 Photographs* (S.D.N.Y. 1957) 156 F.Supp. 350 *(31 Photographs).* The case concerned the efforts of Indiana University's Institute for Sex Research, Inc. (known as the Kinsey Institute) to import obscene materials to study sexual behavior and assist the prison system in understanding and treating deviants. Importation of the material violated the Tariff Act of 1930.[8] *(31 Photographs,* at p. 351.) Although the New York federal district court applied the now-overruled *Roth* test defining obscenity (*Roth v. United States* (1957) 354 U.S. 476, 488–489 [1 L.Ed.2d 1498, 1509–1510, 77 S.Ct. 1304] *(Roth)* [prurient interest must be evaluated by its appeal to the "average" person]),[9] the court recounted older cases permitting doctors to possess obscene medical books and to import materials. The district court stated the court must look to the intent of the importer, and described a "conditional privilege" available to scientists and scholars. *(31 Photographs, supra,* at pp. 358–359.) Anticipating an attack that the ruling would permit the establishment of other *sex institutes,* the district court stated: "It should be pointed out that the *bona fides* of any such Institute and the research or study to which it claims to be dedicated will be a threshold inquiry in each case. The accumulation of an inventory . . . will tend to negate the assertion of a *legitimate interest.*" (*Id.* at p. 360, italics added.)

The federal court noted the language of the proposed Model Penal Code section. " 'Section 207.10(4)(c) of the Draft provides that non-criminal dissemination of obscenity includes: "dissemination to institutions or individuals having scientific or other special justification for possessing such material." ' " *(31 Photographs, supra,* 156 F.Supp. at p. 361, fn. 24, quoting Model Pen. Code (Tent. Draft No. 6, 1957), § 207.10, subd. (4)(c).)

By 1957, the Model Penal Code's proposed language creating an exemption to obscenity distribution prosecution for educational, scientific, law

---

[8] Title 19 United States Code Annotated section 1305(a).

[9] The *Roth* test has been supplanted by the *Miller* test. (*Miller v. California* (1973) 413 U.S. 15 [37 L.Ed.2d 419, 93 S.Ct. 2607] *(Miller).*)

enforcement, and similar justifications had been circulated by the American Law Institute and noted in a footnote in the *Roth* decision.[10]

The Proposed Official Draft of section 251.4, subdivision (3)(a), of the Model Penal Code, approved in May 1962, refers to an affirmative defense in obscenity prosecutions for "(a) institutions or persons having scientific, *educational, governmental or other similar justification* for possessing obscene material." (Italics added.) (See generally Model Pen. Code & Commentaries, § 251.4 & *History foll. fn. 19, p. 479.)

In the commentaries, the editors noted that "Paragraph (a) resembles provisions found in modern obscenity legislation at the time the Model Code was drafted. Additionally an exemption of this sort was often read into older statutes by judicial decision." (Model Pen. Code & Commentaries, com. 9 to § 251.4, subd. (3), p. 501, fn. omitted.)

As states adopted criminal regulatory schemes for obscenity, legislatures employed a wide variety of language describing a prosecutorial exemption or affirmative defense for scientific or educational research.

Some adopted the bare language of Model Penal Code section 251.4, subdivision (3)(a).[11] Others focused on the nature of the defendant, requiring that the defendant be of a certain profession (e.g., a physician)[12] or an employee of a certain institution (e.g., an employee of an educational institution, library, or hospital, who possesses obscenity within the scope of employment), or a student. (*400 E. Baltimore, supra,* 431 A.2d at pp. 692–693.) Other states added qualifying language, such as "serving the educational purpose of such organization." (Mass. Gen. Laws ch. 272, § 29.)

Some states defined certain categories of organizations exempt from prosecution or to which an affirmative defense applied: " . . . For the purpose of this section[,] '*recognized and established*' shall mean an organization or agency having a full[-]time faculty and diversified curriculum in the case of a school; a church affiliated with a national or regional denomination; [or] a licensed physician or psychiatrist or clinic of licensed physicians or psychiatrists . . . ." (Minn. Stats. ch. 617, § 295, subd. (a), italics added; see also La. Rev. Stats. tit. 14, ch. 1, § 106; Neb. Rev. Stats. ch. 28, art. 8, § 815.)

---

[10] As indicated in *31 Photographs, Roth* quoted language from Model Penal Code (Tent. Draft No. 6, 1957), section 207.10, subdivision (2). (*Roth, supra,* 354 U.S. at p. 487, fn. 20 [1 L.Ed.2d at p. 1508].)

[11] See, e.g., General Statutes of Connecticut title 53a (Pen. Code), chapter 952, section 195; Delaware Code Annotated title 11, chapter 5, section 1362; Kansas Statutes Annotated chapter 21, article 43, section 4301, subdivision (d)(1).

[12] Ohio Revised Code Annotated title 29, chapter 7, section 2907.32, subdivision (B); Mississippi Code Annotated title 97, chapter 29, section 107, subdivision (1)(b).

Some statutes refer to the purpose of the obscenity possession. Of those statutes that focus on the purpose of the possessor, there are several which reference "bona fide" purposes.[13] California, Washington,[14] Georgia,[15] and South Carolina[16] use the term "legitimate."

## C. *California*

The California statute uses the term "in aid of *legitimate* scientific or educational purposes." (§ 311.8, italics added.) The history of its adoption was noted in *Zeitlin v. Arnebergh* (1963) 59 Cal.2d 901 [31 Cal.Rptr. 800, 383 P.2d 152] (*Zeitlin*):

"On June 15, 1961, the Assembly, by a vote of 60-19, refused to concur in the Senate's amendments. An Assembly-Senate conference committee was appointed to break the deadlock. The next day the committee reported out the present version of section 311, with the words 'and is matter which is utterly without redeeming social importance' added to the *definition* of obscenity in section 311 and providing in section 311.8 for a defense if the material be 'in aid of legitimate scientific or educational purposes.' ([4 Assembly J. (1961 Reg. Sess.)] p. 5975.) With these changes[,] the bill passed both houses and was signed by the Governor." (*Zeitlin, supra,* 59 Cal.2d at pp. 919–920.)

Thus, California adopted an obscenity scheme during the period of circulation of the draft sections of the Model Penal Code, modifying the affirmative defense provision by including the word "legitimate," which seems to have been derived from the *31 Photographs* case.

In 1981, the Legislature again used the term "legitimate" when it enacted section 311.3, which prohibits developing or exchanging media involving

---

[13] "Bona fide research" seems to come from *31 Photographs, supra,* 156 F.Supp. at page 360, and *400 E. Baltimore, supra,* 431 A.2d at page 694. (See, e.g., Idaho Code tit. 18, ch. 41, § 4102; Mass. Gen. Laws ch. 272, § 29.)

[14] Washington law provides, "The definition of 'sexually explicit conduct' and other operative definitions demarcate a line between protected and prohibited conduct and should not inhibit legitimate scientific, medical, or educational activities." (Wash. Rev. Code tit. 9, ch. 68A, § 001.)

[15] Georgia law provides: ". . . The provisions of . . . this Code section shall not apply to the activities of law enforcement and prosecution agencies in the investigation and prosecution of criminal offenses or to *legitimate medical, scientific, or educational activities.*" (Ga. Code Ann. tit. 16, ch. 12, § 100, subd. (d), italics added.)

[16] South Carolina exempts "a school, church, museum, public school, college, or university library, government agency, medical clinic, or hospital carrying out its *legitimate* function, or an employee or agent of such an organization acting in that capacity and carrying out a *legitimate* duty of his employment." (S.C. Code Ann. tit. 16, ch. 15, § 385, subd. (C)(2), italics added.)

sexual acts with children: "(c) Subdivision (a) does not apply to the activities of law enforcement and prosecution agencies in the investigation and prosecution of criminal offenses or to *legitimate* medical, scientific, or educational activities, or to lawful conduct between spouses." (§ 311.3, subd. (c), italics added.)

In 1984, the Legislature added a new subdivision to section 311.2 (distribution of child pornography prohibited), creating a similar statutory exemption: "(e) Subdivisions (a) to (d), inclusive, do not apply to the activities of law enforcement and prosecuting agencies in the investigation and prosecution of criminal offenses, to *legitimate* medical, scientific, or educational activities, or to lawful conduct between spouses." (Stats. 1984, ch. 1489, § 1, pp. 5214–5215, italics added.)

A similar exclusion or defense was created in 1985 for proceedings that involved forfeiture of matter depicting a minor engaged in or simulating sexual conduct: "(j) It is a defense in any forfeiture proceeding that the matter seized was lawfully possessed in aid of *legitimate* scientific or educational purposes." (§ 312.3, subd. (j), added by Stats. 1985, ch. 880, § 1, p. 2827, italics added.)

### D.  *The Difference Between Adult and Child Pornography*

At the time California adopted its obscenity prosecution scheme in 1961, the Legislature did not enact a specific statute prohibiting the possession or distribution of child pornography. In 1969, the United States Supreme Court struck down a Georgia law banning the private possession of obscene material as violative of the First Amendment. (*Stanley v. Georgia* (1969) 394 U.S. 557, 568 [22 L.Ed.2d 542, 551, 89 S.Ct. 1243].) In 1973, the United States Supreme Court issued *Miller, supra,* 413 U.S. at pages 24–25 [37 L.Ed.2d at pp. 430–431], augmenting *Roth*'s "prurient interest" test with a more elaborate test requiring an inquiry into the value of the questioned material.[17]

In 1982, the United States Supreme Court issued *New York v. Ferber* (1982) 458 U.S. 747 [73 L.Ed.2d 1113, 102 S.Ct. 3348], distinguished on other grounds in *Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234 [152 L.Ed.2d 403, 122 S.Ct. 1389]. *Ferber* held that distribution of

---

[17] The basic guidelines for the trier of fact must be: "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest . . . ; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." (*Miller, supra,* 413 U.S. at p. 24 [37 L.Ed.2d at p. 431].)

child pornography abused children; child pornography was not subject to the *Miller* test; and distribution could be banned. (*Ferber*, at pp. 757, 760–761 [73 L.Ed.2d at pp. 1122–1125].)

In 1989, California added section 311.11, prohibiting private possession of images of minors under the age of 14 engaging in or simulating sexual conduct. (Added by Stats. 1989, ch. 1180, § 2, p. 4568.)

In 1990, the United States Supreme Court upheld an Ohio statute that prohibited private possession of child pornography. (Ohio Rev. Code Ann. tit. 29, ch. 7, § 2907.323, subd. (A)(3); *Osborne v. Ohio* (1990) 495 U.S. 103 [109 L.Ed.2d 98, 110 S.Ct. 1691].) The high court upheld the state's interest in regulating child pornography because the participants in child pornography are victims of child abuse and the materials are used in a market to exploit children. (*Osborne*, at pp. 109, 111 [109 L.Ed.2d at pp. 108–110].) Unlike adult pornography, child pornography is obscenity per se—the prurient interest of the viewer is irrelevant. However, although the Ohio statute construed in *Osborne* did contain exemptions from prosecution for possession for " '*bona fide* artistic, medical, scientific, educational, religious, governmental, judicial, or other proper purpose' " or by certain persons having a " '*proper* interest in the material,' " the high court did not rely on these exemptions to uphold the statute. (*Id.* at pp. 106–107 [109 L.Ed.2d at pp. 107–108], italics added.)

Nevertheless, in 1989 when section 311.11 was adopted and in 1994, when the California Legislature amended it to prohibit content of a person "under the age of 14 years" to "under the age of 18 years,"[18] this child pornography prohibition statute was placed in the same chapter covered by the affirmative defense already embodied in section 311.8. Thus, under California law, any defendant charged with violating section 311.11 was entitled to an instruction on the affirmative defense of *scientific research* established by section 311.8.

### E. *Marler Is Inapplicable*

The trial court's instruction relies on *Marler, supra,* 199 Cal.App.2d at page Supp. 894. The trial court stated that the factors set forth in the *Marler* decision are "consistent with" the statutory defense in section 311.8. We disagree.

The *Marler* decision by the former appellate department (now appellate division) of the San Bernardino County Superior Court did not interpret section 311.8 despite its reference to the intervening adoption of the statute.

---

[18] Section 311.11 was added by Statutes 1989, chapter 1180, section 2, page 4568, and amended by Statutes 1994, chapter 55, section 4, pages 436–437.

(*Marler, supra,* 199 Cal.App.2d at p. Supp. 892.) Defendant Marler was tried for violating a municipal obscenity ordinance, prior to the adoption of section 311.8. The appellate department's opinion was filed after the statute's enactment. The *Marler* opinion relied on *31 Photographs* (a New York federal district court case), and explicitly adopted not only its conclusions but its reasoning. (Cf. *Marler, supra,* 199 Cal.App.2d at p. Supp. 892; *31 Photographs, supra,* 156 F.Supp. 350.) The similarity between the factual situations in *31 Photographs* and *Marler* is striking, inasmuch as both defendants possessed purportedly obscene material in order to treat sexual deviants. The *Marler* court adopted the *31 Photographs* rationale that this material could not be obscene when "in good faith it is to be used exclusively within a professional group pursuing legitimate professional purposes where the material is germane to such purposes, where the material is not likely to fall into the hands of others, and where it is not probable that the material will appeal to the prurient interests of the average person within the group." (*Marler,* at p. Supp. 894.)

This dicta in *Marler*, addressed to its facts, does not explain the use of the term "legitimate" in section 311.8. Rather, its rationale was taken from *31 Photographs*, which applied an outdated obscenity standard (*Roth, supra,* 354 U.S. 476) to federal law.

■ When the California Legislature adopted a comprehensive regulatory scheme, it chose not to include the clarifying language referenced by the trial court, such as "good faith" or "bona fide," or any of the elaborate definitions of exempt individuals and institutions which have been adopted in other states. It simply required that the research be "legitimate." Hence, it does not matter whether the *Marler* language is dicta or not—the *Marler* ruling has limited persuasive value. Accordingly, the *Marler* factors cannot be seen to construe the plain language in section 311.8 or to have established formal standards for evaluation of the evidence.

The California Legislature has not elaborated on its definition of the affirmative defense set forth in section 311.8, subdivision (a), in more than 30 years, and has continued to include the term "legitimate" in subsequent companion penal statutes.

### F.  *"Legitimate" Is Not a Technical Term*

Thus, the only remaining justification for the trial court's augmentation of a statutory defense is whether it amplified or clarified technical legal terms in order to assist the jury. The question is whether "legitimate" is a technical legal term requiring explanation. We conclude it is not.

"When a word or phrase ' "is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request." ' [Citations.] A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning. [Citation.] Thus, . . . terms are held to require clarification by the trial court when their statutory definition differs from the meaning that might be ascribed to the same terms in common parlance." (*People v. Estrada* (1995) 11 Cal.4th 568, 574–575 [46 Cal.Rptr.2d 586, 904 P.2d 1197].) However, absent a request, the court has no duty to define terms which are commonly understood by those familiar with the English language. (*People v. Anderson* (1966) 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366].)

We give words their ordinary meaning:

"Legitimate" is defined as: "b. transf. Genuine, real: opposed to 'spurious.' " (Oxford English Dict. (2d ed. CD-ROM 1992).)

"Legitimate" is elsewhere defined as: "1. Being in compliance with the law; lawful: *a legitimate business.* 2. Being in accordance with established or accepted patterns and standards: *legitimate advertising practices.* 3. Based on logical reasoning; reasonable: *a legitimate solution to the problem.* 4. Authentic; genuine: *a legitimate complaint.* . . ." (American Heritage Dict. of the English Language (4th ed. 2000) <http://www.bartelby.com> [as of Mar. 8, 2004].)

While the factors included in the prosecution's instruction might be examples of certain *legitimate* scientific or educational research, they are narrower than the usual definitions and, in our view, more restrictive than the statutory term of "legitimate." Several reasons support this conclusion.

■ First, unlike other states, and contrary to the instruction, California does not require that the scientific or educational purposes be attached to a scientific or educational *group* with a *professional* purpose or that the pornography be *germane* to the purpose.

■ Second, whether the pornography contained on defendant's computers and CD's was "likely to fall into the hands of others" unconnected to scientific or educational research is of marginal relevance, given the pervasiveness and speed of Internet transmission.

■ Third, whether the pornography appeals to the prurient interests of the *average person* within the scientific or educational *group* includes two

irrelevant factors: No group affiliation is required under California law for *legitimate* research; also, appealing to the *prurient interest* of anyone is relevant only to an obscenity evaluation, not to possession of child pornography, which does not depend on the interest of the viewer for its illegality.

■ Therefore, we conclude "legitimate" is a word of ordinary meaning capable of interpretation by juries, and inclusion of these factors in the jury instruction was error.

### G. *The Error Was Not Prejudicial*

■ We find that the erroneous inclusion of the *Marler* factors did not deprive defendant of a defense. The challenged portion of the instruction uses the questions as optional *factors*, which may or may not be considered in determining whether the defense applied—not as *elements* of the defense. Contrary to defendant's claim, the error did not deprive defendant of due process. Defendant's reliance on adult obscenity cases invokes constitutional protections inapplicable to child pornography cases. Defendant received the statutory affirmative defense instruction. Therefore, the degree of harm is measured under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243], rather than *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. (See *People v. Williams* (1988) 45 Cal.3d 1268, 1314 [248 Cal.Rptr. 834, 756 P.2d 221].)

Further, defendant's real objection seems to be to the word "legitimate," which does limit application of the affirmative defense more than he would choose, but not impermissibly so. There is no question that it is exponentially more difficult to establish that private possession of illegal material is for a *legitimate* scientific or educational purpose. However, that term remains in section 311.8, and its application to the facts of each case is for the jury to determine.

The circumstances surrounding defendant's possession of multiple incestual and bestiality images involving minors do not even hint at any legitimate educational or scientific purpose, rendering the error harmless under any standard. The possession was unrelated to defendant's employment or education. The jury heard testimony from defendant's sexual partners concerning his long history of Internet use to advance his sexual proclivities. The jury saw e-mail from defendant not only acting out sexual activity with persons posing as minors, but stating he was thinking of having sex with his daughter. Thus, defendant's stockpiles of material were augmented by his admitted actual participation in child-centered online sexual activity. A reasonable jury

would not find the defendant's involvement with, and long-term possession of, child pornography to be legitimate scientific or educational research. Had the jury been given the instruction without the *Marler* factors, we conclude it is not reasonably probable that an outcome more favorable to defendant would have resulted. No miscarriage of justice occurred.

## DISPOSITION

The judgment is affirmed.

Scotland, P. J., and Sims, J., concurred.

A petition for a rehearing was denied March 24, 2004, and appellant's petition for review by the Supreme Court was denied June 9, 2004.