Filed 12/30/14  P. v. Taylor CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038655 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. F20301) |
| v. | |
| JAMES EDWARD TAYLOR, | |
| Defendant and Appellant. | |

A jury found James Edward Taylor (appellant) guilty of four counts of committing a lewd or lascivious act on a child under the age of 14 years (Pen. Code, § 288, subd. (a), counts two and three—victim Jane Doe I, counts six and eight—victim Jane Doe II), and one count of attempted lewd or lascivious act on a child under the age of 14 years (Pen. Code, §§ 288, subd. (a), 664, count five—victim Jane Doe I). As to counts two, three, six, and eight, the jury found true the special allegation that appellant committed the acts against more than one victim within the meaning of Penal Code sections 667.61, subdivision (b) and 1203.066.[1]

Subsequently, on July 20, 2012, the court sentenced appellant to 15 years to life in prison. On August 10, 2012, appellant filed a notice of appeal.

On appeal, appellant claims that the trial court erred when it allowed the prosecution to use evidence of child pornography, which had been found on his

---

[1]    The jury found appellant not guilty of three more counts of committing a lewd or lascivious act on a child under 14 years of age; counts one and four involved Jane I and count seven involved Jane II.

computers, to prove his propensity to commit sex crimes and his intent. Second, he claims that the trial court's erroneous admission of the child pornography evidence had the legal consequence of violating the due process clause of the Fourteenth Amendment because it rendered his trial fundamentally unfair. Finally, appellant contends that his sentence of 15 years to life constitutes cruel and/or unusual punishment under the federal and California Constitutions based on the particular facts of his offenses and his background. For reasons that follow, we affirm the judgment.

*Facts and Proceedings Below*[2]

Jane II[3] lived with her mother and brother in the Santa Cruz mountains. At the time of trial in 2012, Jane II was 10 years old. Jane II's family lived on a large lot, which had a house and a studio that was used as a play room/storage/guest room. The studio was approximately 15 to 16 yards from the house. Previously, Jane II's family had lived in another house for 10 years.

Jane II's mother had known appellant for 18 to 20 years; they were good friends. Frequently, Jane II's mother and the children would get together with appellant and his family. They stayed at each other's homes overnight. When appellant and his family visited Jane II's family, Jane II would play in the studio with her brother, her friend Jane I, appellant's son, and appellant.

Appellant drove a van that had a roof that lifted into a pop-up tent. During appellant's visits to Jane II's family, Jane I and Jane II would play in the van's pop-up tent. The girls would climb up onto the driver's seat and then into the pop-up tent; they were able to climb all the way without help. Appellant would watch the girls while they played in the van; the other adults were inside the house. When the girls played in the

---

[2]    The witnesses described events that appear to have occurred sometime between 2005 and the end of November 2010.

[3]    We refer to the victims in this case as Jane Doe I and Jane Doe II to protect their anonymity; for ease of reading we abbreviate their names to Jane I and Jane II.

van, appellant sometimes helped them climb up into the tent even though they did not want or need help.

Jane I testified that when appellant helped them climb in the van, appellant touched her vagina over her clothes. Jane II gave similar testimony. Jane II said it happened on at least two or three occasions. Jane I said it happened only once to her. Jane II said that they told appellant to stop. Jane II felt strange and "kind of upset" when appellant touched her. Jane II knew it was wrong for appellant to touch her because "people shouldn't touch down there." Appellant always touched her in the same spot.

Appellant touched Jane II while they were in the studio. The girls were jumping around and tackling appellant. There were no adults around except appellant; appellant touched Jane II on her vagina. Jane I described a similar incident where appellant attempted to touch her and Jane II, but Jane II kicked and scratched appellant.

Jane I described an event that she said happened at Jane II's old house. She was sitting on the floor with her legs in a V. Appellant's daughter was sitting on appellant's lap when she dropped a music box and appellant picked it up. As he did so, appellant touched Jane I on her vagina; she described it as a "flick." At first, Jane I thought it was an accident. Jane I testified about another incident that happened at Jane II's new house and took place in the bedroom. She was playing the "tickle monster game" with Jane II, appellant's son, and Jane II's brother. Appellant was the tickle monster; he tickled Jane I on her vagina. Jane I testified that it felt "really weird."

Jane II testified that she was afraid to tell adults what happened because she did not want to cause any problems since appellant and her mother had been friends for a long time. However, the girls felt that they needed to do something about appellant's touching them so they wrote him a note. The note read, "Dear Jim, please stop touching our privates. We don't need help getting up places." The girls put the note in the doorway in the back room of the studio where they hoped that appellant would see it.

3

Jane II's mother planned to visit appellant and his family over Christmas and spend the night with them. However, Jane II told her mother she did not want to go; she did not offer an explanation as to why she did not want to go other than she did not want to stay at appellant's house. Jane II refused to visit appellant's house on another occasion, also without explanation.

Jane II's mother found the note the girls had written to appellant on Christmas Eve. The outside of the note read, "if you're not Jim, please don't read this." Jane II's mother was shocked at the contents of the note and at seeing her daughter's name at the bottom. Jane II's mother spoke to Jane II about the note; Jane II admitted writing it. Jane II cried and said she did not want to talk about it. Jane II's mother did not want to cause her daughter any more distress so she dropped the matter after finding out the basic details.[4] Jane II's mother called the police a few days later; she let Jane I's mother know about the letter. Eventually, Jane II's mother took Jane I and Jane II to the sheriff's office.

Detective McCoy interviewed Jane II; Jane II demonstrated how appellant had touched her. Sergeant Todd Liberty interviewed Jane I. Jane I said she did not feel comfortable telling him about what had happened, but she tried to be honest. Jane I's mother asked that Jane I be interviewed by Detective McCoy. On March 14, 2011, Detective McCoy interviewed Jane I. Jane I told Detective McCoy about the incident when she was sitting on the floor with her legs in a V, the incident when she was playing the tickle monster game, and the incident when appellant touched her vagina while she was climbing in the van. All the interviews were recorded and the recordings were played for the jury.

---

[4]     Jane II's mother confirmed that Jane I spent time with Jane II when appellant was present. She remembered that Jane I was present at her son's birthday party in November 2010, and appellant was at her house sometime in June, but she was not absolutely sure that Jane I was there then.

4

Detective McCoy asked Jane II's mother to place a pretext telephone call to appellant. Jane II's mother placed the first call on January 7, 2011. In this first telephone call, Jane II's mother told appellant that Jane II told her that he had "touched her inappropriately on the private parts." Appellant denied that he "would have done anything wrong." When asked whether he touched Jane II while she was climbing up in the van, appellant said, "Uh, okay. Well I did kinda grab them when they were going up there but I wasn't—don't worry. I'm not gonna have sex with your daughter or anything like that but . . . ." Appellant could not explain why he had grabbed the girls. When asked if he was attracted to Jane II, appellant said "No. I'm not gonna hurt your daughter. Not, I mean not sexually. No. I mean she's very cute. I love her but I'm not gonna wanna have sex with her." When asked if he had sexual fantasies about little girls, appellant responded "No. I just said—I just think they're—they're cute. That's all. You know, I just—well . . . something happened to me when I was growing up. I'm just kinda like seeing how kids grow up, what they're like . . . how they act at different ages. I'm not trying to get her to do anything she doesn't want to do." When Jane II's mother asked what appellant meant by that, appellant replied, "just seeing how [Jane II]'s matured."

Appellant explained to Jane II's mother that he had been molested as a child as had his wife. He said, "And I'm just kinda confused about how—growing up because like when I was growing up I was always doing things like that but I don't know if it's—it's 'cause of what happened to me or if it was normal. And I just like—not that I like feeling up kids, it's just like I'm seeing what . . . what they're like when they grown [*sic*] up—when they're ready for things. I know I'm not doing anything like—other than like—well the pushing them up on the rack. I mean that was . . . the van was like the only thing that I really did that was inappropriate I guess. I'm not trying to encourage them or do anything that they're too young to do. I'm just trying to find out for myself when kids feel they're okay to do things."

5

Again, appellant said that he was not going to have sex with Jane II; he agreed "[s]he's too young for that." When Jane II's mother told appellant that Jane II had described his fingers moving and touching her in between her legs, appellant responded, "Okay. Um I'm sorry. Maybe—I don't remember it that way but maybe I was." Appellant asked if he could talk to Jane II's mother in person, but she said that she was not ready to see him. Appellant told Jane II's mother that Jane II was "very cute" and that he loved her; he reiterated that he was not going to try to have sex with her. He said that he liked "seeing children grow" and there was nothing sexual about it, he just wanted to make Jane II happy. Jane II's mother asked if appellant wanted to touch Jane II under her clothes. Appellant responded, "Um, no, not really. I don't think so because, I mean . . . touching is just, touching is just like contact. It's not that I want to touch her private parts because she's young or because she's a woman. It's just because—well, you feel connected to people." Appellant said that he had "never done this before." He continued, "I'm not tickling them in the right spots. I'll try to not do that anymore. Maybe I'm trying to get, not very sexual, but stimulating them probably I shouldn't do that."

On January 11, 2011, Jane II's mother made a second pretext telephone call to appellant. During this telephone call, appellant told Jane II's mother that his actions were in response to a time when Jane II rubbed herself up and down on him and he realized that she was discovering that she could stimulate herself. Appellant wondered how "advanced" Jane II was, "how far along" she was and he thought she was curious "about what her body felt" but he was not "[going to] coerce her into doing anything." Appellant explained that when he was pushing up Jane II in the van he was "just checking to see just how she felt in that area."

Appellant said that because he had seen in chat rooms "girls all different ages show themselves," he was checking to see at what stage Jane II was, whether she was "adventurous and inquisitive" or "a regular girl." He told Jane II's mother that he was

6

not trying to do anything wrong, but was doing it so he could tell Jane II what was "right" and what was "wrong." When Jane II's mother asked him if he was sorry that he "molested" Jane II, appellant responded, "Yes."

*Evidence Relating to Appellant's Possession of Child Pornography*

Based on statements that appellant had made during the pretext telephone calls that he had seen girls in chat rooms showing themselves, Sergeant Liberty became concerned that appellant was watching child pornography. Sergeant Liberty executed a search warrant at appellant's house on January 13, 2011. Sergeant Liberty seized two computers—a laptop and a desktop. Sergeant Liberty turned over the computers to Inspector Tripp, an expert in computer investigations. Inspector Tripp used a program called EnCase and other forensic investigation programs to analyze appellant's computers. Inspector Tripp determined that the computers were used to access child pornography. He testified extensively. Some of the testimony was about the actual child pornography, but a significant amount of time was spent in explaining where he located the child pornography, how the child pornography could not have been downloaded accidently, and how it had been viewed.

As to the location of the child pornography, Inspector Tripp found a folder nested in the My Documents folder on the desktop computer; it was called thumbs.db. Inspector Tripp explained that this is a file where the computer automatically keeps thumbnail copies of images accessed on the Internet. The folder contained an image of a prepubescent girl dressed provocatively in lingerie and a Santa hat posing in sexually provocative poses. No genitalia were shown in the photograph that was published to the jury. However, all the thumbnail photographs that were in the folder were admitted into evidence.

Inspector Tripp created a report of the local access history of the desktop computer from January 2008 to January 2011. He testified that if the same file was listed on different days in the local access history that meant that the file was opened repeatedly.

7

Inspector Tripp, located a file named "cum for litl girl.pm4," which was opened in Internet Explorer, and a video called "baby rape.avi" was accessed on the computer. The ages of the children were sometimes depicted in other file names such as "nine-year-old Suzie Q compilation," which was accessed on November 5, 2010, and "daughters 5 and 11-year-old anal and vaginal.jpg." The latter file was stored in the My Documents folder in a folder called "Rick's books" in a subfolder called "video." "young lass.rar" was opened on the computer on December 3. Inspector Tripp was not able to find the actual files, so he was not sure what they contained. However, he testified that in his training and experience ".rar" files are commonly used by people who share child pornography. A file sharing site called "stickam" was used on the computer. Another file that was accessed on appellant's computer was "new Tara with three exclamation points, and then in parenthesis" PTHC. According to Inspector Tripp, PTHC stands for "preteen hardcore" and refers to prepubescent teenage hardcore pornography—and this "typically refers to sexual intercourse or penetration."

Inspector Tripp explained that files in the "downloads" folder are not automatically downloaded by the computer; a user has to actively download the files stored there. Temporary files could populate the computer if one were just watching a video online, but they would not populate the download folder. Inspector Tripp testified that in his experience investigating child pornography cases he finds it more common that there are many artifacts[5] found on computers but not much actual pornography.

Inspector Tripp used EnCase to generate a report of the Real Player history, including five files containing child pornography videos. These files had been unpackaged and played on December 19, 2011. Inspector Tripp captured some screen shots from the videos and he testified in detail about their contents. Inspector Tripp testified that all the videos were of children masturbating or engaged in sexualized

---

[5]     Inspector Tripp testified that an artifact is "something that shows something existed prior in a computer file system."

activity.[6] Inspector Tripp discussed additional images that appeared in the temporary Internet files on appellant's desktop computer; these included an image of a child with semen in her mouth, a child having intercourse with an adult man, two images of prepubescent girls posing in the nude, an image of a child orally copulating an adult man, and a young naked female with a sombrero. Inspector Tripp testified that all the Web sites where this child pornography was located were accessed in a single browsing session.

Inspector Tripp analyzed appellant's laptop computer. He recovered several child pornography images and files, including one named "Tara 8 Y-R suck, fuck June 10, 2008;" a recently viewed file called "New PTHC, daddy's girl 12 year old, daddy's BJ";[7] a file called "nine year old SuzyQ";[8] a file called "Very young Thai"; and a file called "Moscow 5-12 year old really molested." One file was viewed on January 6, 2011.

Inspector Tripp noted that a forensic examination of appellant's work computers revealed the presence of temporary Internet files containing child pornography. He testified that it is "very difficult to find" child pornography online; and successful Web browsing for child pornography is "incredibly difficult." Further, while adult pornography is very prevalent online, in his experience child pornography never appears on these Web sites. Inspector Tripp opined that the child pornography found on appellant's computers did not appear accidentally. He stated that the fact that more than one of appellant's computers had child pornography artifacts on it indicated to him that appellant intentionally sought out and viewed child pornography on various different computers.

San Francisco City Attorney Investigators Barron Fong and Cheri Toney testified

---

[6]    Inspector Tripp burned the videos recovered from appellant's desktop computer onto a disk and this disk was admitted into evidence over defense counsel's Evidence Code section 352 objection.

[7]    Inspector Tripp testified that BJ meant "blow job" in child pornography.

[8]    An identically named file was on appellant's desktop computer.

as computer forensic experts regarding appellant's misuse of City of San Francisco computers. Appellant had access to five computers located at the Legion of Honor and the de Young Museum where he worked. Both investigators examined the Internet history on these computers. They found some child pornography and other work-inappropriate content on computers appellant accessed at work. There were videos depicting the same child on different computers. The investigators determined that only appellant had access to the computers during the time the content was accessed.

Investigator Toney testified that she found on one computer, which appellant used, 33 video files, 29 of which were either child or adult pornography; and on another, 44 video files including 16 that were identified as possible child pornography. She watched all the videos and documented the title and a description of what she saw, the computer on which it was found, and the length of the video. Investigator Toney testified in graphic detail about what some of the videos contained, including one video of an adult male engaged in sexual activity with a prepubescent female child.[9]

Appellant testified in his defense. In essence, he denied touching Jane I and Jane II on the vagina. He said that any touching was to help boost them up in the van. He never did anything to arouse himself or the girls. Appellant said that he never clicked on anything that was child pornography when he was browsing the Internet for foreign news sites, but inadvertently landed on sites that had child pornography. He left these sites as quickly as possible.

Appellant testified that when Jane II rubbed herself on him in a way he perceived to be self-stimulation, he was interested to see whether that was what she was doing because he was curious about her development; he was curious about when children are

---

[9]     Exhibit No. 80 was admitted into evidence. Exhibit No. 80 was a disk of the videos that Investigator Toney described for the jury that were found on appellant's work computers.

ready to behave sexually. Although he was interested in the development of children, he really wanted to make sure that children stay safe.

Appellant said that he found the first pretext telephone call with Jane II's mother stressful. During the second pretext telephone, he attempted to explain that he felt protective of Jane II and Jane I, but used the wrong choice of words. Appellant said that he felt that Jane II needed the "birds and the bees" talk because she seemed confused and tried to "stimulate herself" on him. Appellant was not able to explain why he did not simply deny inappropriately touching the girls during either pretext call.

Appellant's expert, Robert Young, testified that one can mistakenly get pornography on one's computer when many windows are open; that Web pages can open even if the user does not see them; and videos can play automatically. He illustrated how pictures the computer user did not know about could appear in the computer's cache and the temporary Internet files folder.

Young testified that it was possible for a user to click on the wrong file and that video titles may be misleading. He said that it was not difficult to find child pornography on the Internet and it was possible to run into it via linked surfing on third world country Web sites. Young stated that he found no evidence that the child pornography on appellant's hard drives was deliberately sought out or viewed; and that appellant's computers contained no searches for child pornography.

*Discussion*

*Admission of Evidence of Appellant's Possession of Child Pornography*

Appellant contends that the court prejudicially erred under Evidence Code section 352[10] when it allowed the prosecution to use the evidence of child pornography seized from his computer to prove his propensity and intent, "because the probative value

---

[10]     All unspecified statutory references are to the Evidence Code.

of that evidence was substantially outweighed by its strong, and obvious, prejudicial impact."

Defense counsel moved in limine to exclude the evidence of child pornography found on appellant's home and work computers. Counsel argued that section 1108 is unconstitutional; the evidence should be excluded under section 352 because its probative value was outweighed by the danger of undue prejudice from its admission; the evidence did not satisfy any of the exceptions in section 1101, subdivision (b); and the admission of the evidence would render the trial fundamentally unfair in violation of his client's due process rights.

During discussions on the admissibility of the evidence of child pornography, the court indicated that the evidence was admissible under section 1108, but it discussed with counsel how much should be admitted and what limitations were appropriate under section 352. Specifically, the court stated that "[s]ome evidence in this regard appears overbroad, how it's coming in. We've had some discussions regarding that. The People have indicated they wanted to perhaps project images. I had suggested that in some of the photos, they could be redacted to block out sexual organs let's say, but the jury could have the photograph, eight by ten, that could be published to the jury."

The prosecutor objected to images being redacted and argued the explicit contents of the pornography were relevant to appellant's intent in touching the girls. The prosecutor wished to play at least a portion of the video clips found on appellant's computers. The court responded that the evidence was relevant and admissible, but needed to be "whittle[d]" down. The prosecutor said she wished to introduce "a sampling from each of the [five] hard drives." Given that each drive contained hundreds of images and dozens of videos, the prosecutor offered to introduce a representative number from each drive.

The prosecutor emphasized, "The other reason that becomes relevant—and I've discussed this in chambers with counsel and the Court—is that the sheer volume

12

undercuts the defense's argument that this was all downloaded inadvertently. The argument is that he was looking at adult porn when this stuff somehow got [into] his computer either via pop-up or it was cached to his internet files. [¶] And there's quite a bit of evidence that undercuts that claim. One, being the adult porn that was recovered from his work computers was downloaded different days and different times than the child porn that they found. And the second being the volume of child porn far outweighs the volume of adult porn, and so I think the numbers [are] significant in that the sheer number alone I think makes the claim that this was inadvertent totally preposterous."

Defense counsel expressed his concern about the size of the images that would be introduced and asked that the evidence be sized correctly so that none of the thumbnail images were blown up to look bigger than they really were. Defense counsel objected to the number of images that the prosecutor proposed would be introduced and pressed the court to allow just an example of a child pornography picture and not "50 images or 20 images." Counsel argued that showing a large number of pictures would be too inflammatory and might tempt the jury to punish appellant for the child pornography and not the charges.

The court found defense counsel's position reasonable and ruled that the prosecution could show "four or five" images "per hard drive"; and that experts could describe the rest of the content. The court allowed the prosecutor to show 30-second samplings of the child pornography videos accompanied by expert testimony describing the total length and content of the videos. The prosecutor stated that she would narrow down the videos to show only three per drive, totaling approximately 10 videos for the entire presentation of evidence.

Defense counsel objected to playing any videos in court as too inflammatory. The prosecutor responded that she could play the videos without sound, but that the videos were highly probative of appellant's sexual interest in children. The court ruled that it would allow "the People to have some. But, again, I don't want the jury to lose sight of

13

the focus here. Mr. Taylor's being prosecuted for a 288, not for the child porn here. And if . . . there's too much it gets to be an imbalance. There's relevance. Good degree of relevance, great degree of relevance I believe because the argument here is intent."

After discussing other issues, the court returned to the issue of the child pornography evidence. The court stated, "And I want to be sure for the record that I've covered the weighing of the introduction of the computer images with the videos. So we've talked about that a lot out here and some in chambers but absolutely there's prejudice to the defense. Okay. But there's a great deal of relevancy as this is a case where the defense was lack of intent. If there was vaginal touching, it was accidental without any sexual intent." Defense counsel confirmed that the court was accurate in its summation. The court went on to say, "So the defendant's intent, his propensity to have interest in children in a sexual way would be relevant based on that. Letting the jury know that he had all of these examples on his computers will be relevant to show that. The Court is going to limit the introduction of that so that it's not as shocking and the jury doesn't . . . lose focus of the reason the defendant's on trial, they're not consumed with that. But they'll need some examples of that. I don't see it being time-consuming[;] prejudice doesn't outweigh the probative value."

Again, defense counsel stated that his objection remained with the amount of the evidence of child pornography that the court was going to allow. The court stated that it would be the least amount necessary to get the point across; the court confirmed that it was admitting the evidence under section 1101 to show intent as well as under section 1108.

During the trial, outside the presence of the jury, the prosecutor explained to the court that she thought defense counsel might have an objection to some exhibits that she wished to have marked and intended to introduce into evidence. She explained that they were screenshots of the videos that were found on appellant's home computers. Defense

counsel objected to the exhibits on the ground that there were multiple pages rather than just one screenshot and therefore the evidence was voluminous.

The court reviewed the evidence. Thereafter, the prosecutor explained that she was not intending to show all of the pages to the jury; that the evidence was in lieu of showing them the video of some of the pornography; and she thought that this was "a middle ground between not showing it at all and playing the actual video." The prosecutor said that it was her intention to show the "first page of maybe two of th[e] exhibits to the jury, not all of them and not all the pages." The court pointed out if the exhibits were marked and admitted then the jury could look at them later. The prosecutor agreed, but pointed out that she had prepared a disk of the videos so that if the jury wanted to watch the videos they could, but she was not going to play it in open court. The court noted that it had not "precluded the People from any of this yet." Rather the court had indicated that the prosecution needed to "whittle it down." The court stated that it had not "seen [the] finished product as to what [she] intended to show until right now." The court reiterated that it had not ruled that the prosecution could not play the disk with the videos. The prosecutor affirmed that was her understanding, but thought that the screenshots would be a "less time-consuming and potentially alienating experience for the jury . . . ." Defense counsel confirmed that he did not object to the screenshots, only the volume of them.

The court asked the prosecutor if she intended to play the disk with the videos for the jury. The prosecutor responded that she was not going to play it with Inspector Tripp on the stand and "potentially not at all." However, if appellant's expert made certain contentions as to what was viewed or not viewed by appellant or he disputed the age of the children, then it might be necessary to play some of the videos.

The court marked the exhibits; and the prosecutor told the court that she intended to publish the first page of two of the screenshots from the different videos. The court told the prosecutor that that was "fine." Defense counsel asked whether they were

15

agreeing to just the first of several pages. The prosecutor said her position was that the first page would be published, but all the pages would be introduced into evidence. Defense counsel said that he was opposed to the rest of the pages and suggested that they tear off the rest of the pages. The court responded "[u]derstood."

During Inspector Tripp's testimony, the prosecutor asked him if he had run each of the videos found on appellant's computer through a screen capture program. Inspector Tripp confirmed that he had. The prosecutor showed Inspector Tripp People's exhibit No. 43 and asked Inspector Tripp if he recognized it. He testified that it was one of the screenshot images of one of the video files that depicted a "prepubescent teen sexual encounter." The prosecutor moved to admit People's exhibit No. 43 into evidence. Defense counsel stated that he had no objection. The prosecutor asked if she could publish the screenshot to the jury. Again, defense counsel said that he had no objection. The prosecutor employed the same procedure with exhibit Nos. 44, 42, 41, and 40; and defense counsel stated that he did not object to the screenshots being admitted into evidence and published to the jury. As to these exhibits, the record indicates that each one was a packet of photographs; some packets had as many as 12 pages with nine photographs per page, and two had as few as three pages with nine photographs per page.[11] As noted, ultimately, the disk with the five videos on it was admitted into evidence as was the disk of videos found on appellant's work computers. However, it does not appear from the record that the jury ever viewed either of these disks.[12]

---

[11] We exercised our authority to request these exhibits from the trial court. (Cal. Rules of Court, rule 8.224(d).) While disturbing, we do not find them to be unduly prejudicial.

[12] During deliberations the jury requested a "prop[]er programs to watch the videos." The court asked the jury which programs did not play and to send out the disks they wished to view. The jury sent out People's exhibit No. 31, the interview of Jane II, exhibit No. 33, the interview of Jane I, exhibit No. 62, the recording of the first pretext telephone call and exhibit No. 63, the recording of the second pretext telephone call.

At the outset, we note that possession of child pornography is a crime. (Pen. Code, § 311.11, subd. (a).) Specifically, Penal Code section 311.11, subdivision (a) provides in part: "Every person who knowingly possesses or controls any matter, representation of information, data, or image, including, but not limited to, any film, filmstrip, photograph, negative, slide, photocopy, videotape, video laser disc, computer hardware, computer software, computer floppy disc, data storage media, CD–ROM, or computer-generated equipment or any other computer-generated image that contains or incorporates in any manner, any film or filmstrip, the production of which involves the use of a person under 18 years of age, knowing that the matter depicts a person under the 18 years of age personally engaging in or simulating sexual conduct, as defined in subdivision (d) of [Penal Code] Section 311.4, is guilty of a felony." Further, possession of child pornography is a sexual offense as defined in section 1108, subdivision (d)(1).

Generally, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (§ 1101, subd. (a).) However, in a criminal action in which a defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense is not made inadmissible by section 1101, so long as the evidence is not made inadmissible by section 352. (§ 1108, subd. (a).) The California State Legislature enacted section 1108 to "relax the evidentiary restraints" imposed by section 1101, "expand the admissibility of disposition or propensity evidence in sex offense cases," and "assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility." (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).)[13]

_____

[13]    In *Falsetta*, the Supreme Court noted: "[T]he Legislature's principal justification for adopting section 1108 was a practical one: By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating

17

"By removing the restriction on character evidence in section 1101, section 1108 now 'permit[s] the jury in sex offense . . . cases to consider evidence of prior offenses *for any relevant purpose*' [citation], (italics added), subject only to the prejudicial effect versus probative value weighing process required by section 352." (*People v. Britt* (2002) 104 Cal.App.4th 500, 505; accord *People v. Robertson* (2012) 208 Cal.App.4th 965, 990 (*Robertson*).)  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.)  Factors to weigh include the "nature, relevance, and possible remoteness [of the uncharged sex offense], the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta*, *supra,* 21 Cal.4th at p. 917.)

Prejudice as contemplated by section 352 is not so sweeping as to include any evidence the opponent finds inconvenient.  Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent.  The ability to do so is what makes evidence relevant.  The code speaks in terms of *undue* prejudice.  Unless the dangers of undue prejudice, confusion, or time consumption *substantially outweigh* the probative value of relevant

---

evidence.  The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations.  Section 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes." (*Falsetta*, *supra*, 21 Cal.4th at p. 915.)

evidence, a section 352 objection should fail. (*People v. Scott* (2011) 52 Cal.4th 452, 490-491.) Evidence should be excluded as unduly prejudicial " ' "when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." ' " (*Id.* at p.491.; see also *People v. Gionis* (1995) 9 Cal.4th 1196, 1214 [prejudice set forth in § 352 does not refer to prejudice or damage to a defense that naturally flows from relevant, highly probative evidence, but applies to evidence that uniquely tends to evoke an emotional bias against the defendant as an individual and has very little effect on the issues].)

We review a trial court's evidentiary ruling under sections 1108 and 352 for abuse of discretion and will reverse only if the ruling was arbitrary, whimsical, or capricious as a matter of law. (*Robertson*, *supra*, 208 Cal.App.4th at p. 991.)

As noted, "[t]he prejudice [that] exclusion of evidence under [section 352] is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[All] evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in [section 352] applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

Our Supreme Court has held evidence of child pornography admissible under section 352 in circumstances similar to these. In *People v. Memro* (1995) 11 Cal.4th 786 (*Memro*), overruled on another point in *People v. Gaines* (2009) 46 Cal.4th 172, 181, footnote 2, the trial court admitted evidence of sexually suggestive and nonsexually suggestive photographs depicting clothed and unclothed prepubescent youths, "as

19

evidence of motive and intent to perform a lewd or lascivious act on [the victim] in violation of section 288." (*Memro*, *supra*, at p. 864.) The court held the trial court did not abuse its discretion because "the photographs, presented in the context of defendant's possession of them, yielded evidence from which the jury could infer that he had a sexual attraction to young boys and intended to act on that attraction." (*Id*. at p. 865.) The *Memro* court explained: "To be sure, some of this material showed young boys in sexually graphic poses. It would undoubtedly be disturbing to most people. But we cannot say that it was substantially more prejudicial than probative, for its value in establishing defendant's intent to violate section 288 was substantial." (*Ibid*.)

Certainly, testimony about the amount of child pornography that appellant possessed suggested that the presence of child pornography on appellant's home and work computers was more than coincidental; and it undercut appellant's position that he downloaded the child pornography inadvertently.[14]

In the instant case, appellant was charged with one count of attempting to commit a lewd or lascivious act upon a child under the age of 14 and seven counts of committing a lewd or lascivious act upon a child under the age of 14. Appellant's possession of child pornography was material to the issues in this matter. A plea of not guilty puts in issue every material allegation of the accusatory pleading. (See *People v*. *Steele* (2002) 27 Cal.4th 1230, 1243.) In order to convict appellant of violating Penal Code section 288,

---

[14]  Appellant does not challenge the *amount* of child pornography evidence that was admitted in this case. Rather, his argument is that none of the evidence should have been admitted because the nature of the evidence created a substantial danger of undue prejudice against him that far outweighed its probative value. Although both sides took several days to present testimony regarding the child pornography appellant possessed, given that appellant's defense was that the child pornography was inadvertently downloaded onto his computer, the prosecution was put to the task of disproving that position and appellant was put to the task of supporting his position. This involved presenting highly technically complex evidence that caused the trial to be several days longer than it would otherwise have been. The actual child pornography evidence, i.e., images and descriptions of videos, took much less time.

20

subdivision (a), the prosecution had to prove that appellant touched the girls intending sexual gratification for him or for them. (Pen. Code, § 288, subd. (a).) Hence, appellant's not guilty plea placed his intent in issue. In other words, by pleading not guilty, he necessarily claimed that he did not have the intent to arouse, appeal to, or gratify his lust, passions, or sexual desires. (See *People v. Whitham* (1995) 38 Cal.App.4th 1282, 1290 [Pen. Code, § 288 is a specific intent crime]; see also *People v. Montes* (2003) 112 Cal.App.4th 1543, 1549 [an attempt to commit any crime requires a specific intent to commit that particular offense].) Evidence of appellant's possession of child pornography was relevant to prove intent as well as impugn his credibility. The images and videos found on appellant's computers were of underage girls, either semi-clothed or unclothed, masturbating or performing sex acts with adults. The jurors could reasonably find appellant to have had an unnatural and abnormal sexual proclivity toward underage girls and, in turn, infer that he had the requisite mental state for each charged offense. (See *In re Mariah T.* (2008) 159 Cal.App.4th 428, 440 [because intent for purposes of Pen. Code, § 288 can seldom be proven by direct evidence, it may be inferred from the circumstances].)

Appellant's argument that the trial court erred in this case is based primarily on his assertion that "the evidence pertaining to the *charged* offenses . . . was relatively free of testimony likely to cause the jury to feel revulsion and outrage toward" him.[15] He asserts that what was done to the children in the pictures and videos found on his computer and what was suggested by the file names for which matching images were not found, was far more invasive and harmful, far more offensive to people's sensibilities, than the brief over-the-clothing touching to which the girls testified.

---

[15] Appellant argues that the prosecution had better evidence bearing on the question of his intent, including the pretext telephone calls. We disagree. In the pretext telephone calls, repeatedly, appellant denied that his intent was to arouse the girls or himself.

21

We disagree. We believe appellant's conduct in the present case was "more likely to have aroused the passions of the jurors against him." (*Robertson*, *supra*, 208 Cal.App.4th at p. 993.) Appellant was a friend of Jane II's mother and he held himself out to be a friend to the girls—always playing with them and spending time with them when he visited. He used a position of trust to facilitate his behavior. The possession of child pornography was far less inflammatory than the current charges; it did not involve *appellant's* harmful acts on two minor victims who trusted him. While the child pornography images were distasteful and disgusting, they did not involve *appellant* actually participating in doing something to the children in the videos and photographs.

Although there are obvious differences between molesting young girls and watching videos and viewing images of young female children masturbating and engaging in sex acts with adults, absolute similarity has never been required.[16] In this case, there is an overriding similarity; both the possession of child pornography and molesting young girls reflects an inappropriate and deviant sexual interest in children. Evidence of the correlation between sex offenses against children and interest in child pornography is found in the numerous cases in which persons charged and/or convicted of lewd conduct with children were also charged and/or convicted of possession of child pornography. (See, i.e., *People v. Anderson* (2009) 47 Cal.4th 92, 99; *People v. Fields* (2009) 175 Cal.App.4th 1001, 1005; *People v. Garelick* (2008) 161 Cal.App.4th 1107, 1111; *People v. Nicholls* (2008) 159 Cal.App.4th 703, 704; *People v. Hertzig* (2007) 156 Cal.App.4th 398, 400; *People v. Woodward* (2004) 116 Cal.App.4th 821, 825; *People v. Spurlock* (2003) 114 Cal.App.4th 1122, 1126; *People v. Johns* (1997) 56 Cal.App.4th

---

[16] As the California Supreme Court recognized in *People v. Loy* (2011) 52 Cal.4th 46, section 1108 conduct need not be similar to be admissible. " '[T]he charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise Evidence Code section 1108 would serve no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in section 1108.' [Citation.]" (*People v. Loy*, *supra*, at p. 63.)

550, 552.)  The explanation for this correlation was recognized by the Legislature in enacting section 1108—that is, that the willingness to commit a sexual offense is not common to most individuals; thus, evidence of any prior sexual offenses is particularly probative and necessary for determining the credibility of the witness.  (*People v. Callahan* (1999) 74 Cal.App.4th 356, 367.)  Sex offenders are not specialists, and they may commit a variety of offenses that differ in specific character.  (*Id*. at p. 368.)

In sum, we conclude the trial court did not abuse its discretion when it admitted evidence of appellant's possession of child pornography because the probative value far outweighed the prejudicial effect.

Finally, we note that the jurors convicted appellant of counts two, three, five, six, and eight and acquitted him of counts one, four, and seven.  This affirmatively demonstrates that they carefully examined all the evidence and reached a sensible verdict.  Had they been inflamed, "[they] would have convicted [him] of all charges."  (*Robertson*, *supra*, 208 Cal.App.4th at p. 994.)

*Alleged Due Process Violation*

Appellant contends that the trial court's erroneous admission of the evidence that he possessed child pornography had the legal consequence of violating the due process clause of the Fourteenth Amendment, because it rendered his trial fundamentally unfair.  We are not persuaded; the evidence was not erroneously admitted.

" 'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' [Citation.]"  (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.)  "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'  [Citations.]  Only under such circumstances can it be inferred that the jury must

23

have used the evidence for an improper purpose."[17] (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920; see *People v. Kelly* (2007) 42 Cal.4th 763, 787.)  As the United States Supreme Court has explained, "[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.  We, therefore, have defined the category of infractions that violate 'fundamental fairness' very narrowly."  (*Dowling v. United States* (1990) 493 U.S. 342, 352.)

The evidence relating to appellant's possession of child pornography was certainly damaging.  However, although the videos, screenshot photographs, and testimony describing the videos were abhorrent and disturbing because the evidence involved child pornography, the evidence did no more than accurately portray the child pornography found on appellant's hard drives.  We cannot conclude that the presentation of this evidence rendered appellant's trial fundamentally unfair.

*Alleged Cruel and Unusual Punishment*

Penal Code section 667.61 mandates punishment of 15 years to life for a lewd or lascivious act under Penal Code section 228, subdivision (a) when a "defendant has been convicted in the present case . . . of committing [such] offense . . . against more than one victim."  (Pen. Code, § 667.61, subds. (b), (c)(8), (e)(4).)  Following Penal Code section 667.61, the trial court imposed a sentence of 15 years to life on count two, but ran the 15 year to life terms on counts three, six and eight concurrently.

As noted, appellant asserts the imposition of a sentence of 15 years to life in prison for each of his crimes constitutes cruel and/or unusual punishment in violation of the California and federal Constitutions.

Since the California Constitution's prohibition against cruel or unusual punishment is arguably broader than the United States Constitution's prohibition against cruel and unusual punishment, we analyze defendant's contention under the California

---

[17]    There is no evidence that the jury used the child pornography evidence for an improper purpose; as noted they found him not guilty of three counts.

standard only.  A punishment that satisfies this standard necessarily also satisfies the federal standard.  (Cf. *People v. Anderson* (1972) 6 Cal.3d 628, superseded by Cal. Const., art. I, § 27 on other grounds.)

We point out that it is the function of the Legislature to define crimes and prescribe punishment; the judiciary may not interfere in this process unless the statutory penalties are so severe, relative to the crime, as to constitute cruel or unusual punishment. (*People v. Dillon* (1983) 34 Cal.3d 441, 477-478.)  As noted in *People v. Estrada* (1997) 57 Cal.App.4th 1270 (*Estrada*), punishment under the one strike law is "precisely tailored to fit crimes bearing certain clearly defined characteristics."  (*Id.* at p. 1280.) "Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive.  [Citations.]"  (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494.)

In analyzing the separate prohibition against cruel or unusual punishments provided in the California Constitution, the California Supreme Court has said that a sentence will violate the state Constitution if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity."  (*In re Lynch* (1972) 8 Cal.3d 410, 424.)  Under the *Lynch* test, courts must consider (1) the nature of the offense and the offender, (2) the punishment for other offenses, and (3) punishment in other jurisdictions for the same offense.  (*Id.* at pp. 425-439.)

Appellant relies heavily on the nature of the offense and the offender prong of the *Lynch* test.  He points out that at the time of sentencing he was 50 years old, with no criminal record.  He received an honorable discharge after six years of service in the United States Navy, during which time he earned a Bachelor of Science degree from the Navy Nuclear Power School in Orlando Florida.  He is married with children of his own. At trial, his wife described him as a good father who was very loving and understanding. Other friends described him as a good father, an involved parent and extremely

25

empathetic to children. Further, a psychological evaluation conducted by Dr. Korpi concluded that the risk of his reoffending was " 'rather low.' " As to the nature of his offense, appellant asserts that his conduct with the two girls may have caused psychological harm, but there was no physical harm to either of the girls. He argues that his touching of the two girls was done over their clothes and was for a brief moment only. Thus, in essence, appellant claims that his sentence is unconstitutional because of the mild nature of the offenses and the sympathetic nature of the offender. We are not persuaded.

When we consider the nature of the offense and the offender, we evaluate the totality of the circumstances surrounding the commission of the current offense or offenses, including the defendant's motive, manner of commission of the crime, the extent of the defendant's involvement, the consequences of his acts, and his individual culpability, including factors such as the defendant's age, prior criminality, personal characteristics, and state of mind. (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1510.)

The fact that appellant has no prior convictions is offset by the fact that appellant committed multiple sex offenses against separate victims. Appellant's lack of any prior convictions is thus "not determinative." (*People v. Martinez*, *supra*, 76 Cal.App.4th at p. 497.) Despite appellant's lack of a criminal record, his behavior in these current offenses, during which, we have no doubt, he psychologically damaged the victims, and his lack of remorse,[18] must be viewed as extremely serious. Given that appellant was a

---

[18]     As the trial court noted, "prior to the trial beginning, I was concerned [that I would] have to impose a sentence like this because it doesn't seem to be a just sentence based on information I had about the case. I had no idea that you would get on the stand the way you did. You perjured yourself hour after hour after hour. You had no remorse. No acceptance of the behavior that you've exhibited here. No acceptance of the damage, the permanent scarring to these two young girls because of your own selfish reasons." The court concluded, "absolutely the sentence is harsh in this case but the Legislature's real clear. When you hurt our children, community's children, there's a big price to pay

family friend who abused a position of trust, and the victims were particularly vulnerable because of their age and relationship with appellant, the opportunistic nature of appellant's crimes militates against a finding that his punishment is so disproportionate to the crimes for which it was inflicted that it shocks the conscience of this court and offends fundamental notions of human dignity. These two young victims trusted appellant and he sexually assaulted them when he should have been protecting them. In the guise of playing with and "helping" these young girls, appellant inflicted damage on these girls, possibly life-long damage, for his own selfish reasons.

Appellant was convicted of four separate acts of molestation. By virtue of these convictions, appellant could have received four consecutive life terms. (Pen. Code, § 669 [when a person is convicted of two or more crimes, the second judgment upon which sentence is ordered to be executed shall direct whether the terms of imprisonment or any of them to which he or she is sentenced shall run concurrently or consecutively. Life sentences, whether with or without the possibility of parole, may be imposed to run consecutively with one another]; *People v. Rodriguez* (2005) 130 Cal.App.4th 1257, 1263 [trial court has discretion to impose consecutive life sentences for four counts of violating Pen. Code, § 288, subd. (a)].) His sentence is much lighter in comparison to some that have been upheld for defendants convicted of similar crimes. (See, e.g., *People v. Snow* (2003) 105 Cal.App.4th 271, 274 [85 years to life for one charge under Pen. Code, § 288, subd. (a), based on additional application of three strikes law]; see also *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 531-532 [upholding sentence of 129 years for 25 offenses against a single victim].)

As to appellant's argument that the penalties are lower for a single violation of more serious offenses in the same jurisdiction, punishment is not cruel or unusual merely because the Legislature may have chosen to permit a lesser punishment for another crime.

for that because it is life-long damage that you inflict for no good reason."

Leniency as to one charge does not transform a reasonable punishment into one that is cruel or unusual. (*People v. Preciado* (1981) 116 Cal.App.3d 409, 412.) Furthermore, the penalty for a single offense cannot properly be compared with the penalty for multiple offenses or multiple offenses against multiple victims. (See *Estrada*, *supra*, 57 Cal.App.4th at p. 1282.)

Finally, appellant's reference to punishment schemes in other jurisdictions is unpersuasive. By failing to actually conduct such a comparison, appellant has failed to meet his burden on appeal to demonstrate that this factor supports his claim of a constitutional violation. (*People v. Crooks* (1997) 55 Cal.App.4th 797, 808 [defendant bears burden of establishing disproportionality].) Furthermore, the fact "that some other jurisdictions allow for the same or even harsher punishment . . . indicates that in the abstract, the One Strike term imposed here is not irrational or obviously excessive punishment . . . ." (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 200 (*Alvarado*); accord, *Estrada*, *supra*, 57 Cal.App.4th at p. 1282.) "The fact that the sentence is mandatory merely reflects the Legislature's zero tolerance toward the commission of sexual offenses against particularly vulnerable victims." (*Alvarado*, *supra*, at pp. 200-201.)

In sum, taking into consideration all relevant factors, appellant has failed to establish that his sentence is so disproportionate to his crimes that it shocks the conscience or offends fundamental notions of human dignity.

*Disposition*

The judgment is affirmed.

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.


_____

MÁRQUEZ, J.